# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

and

STATE OF WEST VIRGINIA, by and through
the WEST VIRGINIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

        *Plaintiffs*,

v.

THE CHEMOURS COMPANY and
THE CHEMOURS COMPANY FC, LLC,

        *Defendants*.

CIVIL ACTION:   2:26-cv-00418

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of West Virginia, by and through the West Virginia Department of Environmental Protection ("WVDEP"), file this Complaint, and allege as follows:[1]

### INTRODUCTION

1.      This civil action arises from years of historic and ongoing pollution of per- and polyfluoroalkyl substances ("PFAS"), known as forever chemicals, from three of Defendants'

---

[1] The Second, Third, and Fourth Claims for Relief alleged in this Complaint are brought by the United States and West Virginia. The remaining claims are brought by the United States only. West Virginia joins the allegations related to the Second, Third, and Fourth Claims for Relief, i.e., those in Paragraphs 1–2, 5–28, 99–103, 231–290, 364–402, and Paragraphs A, D, E, F, I, and J of the Request for Relief.

chemical facilities in West Virginia, North Carolina, and New Jersey. The facilities are Washington Works near Parkersburg, West Virginia; Fayetteville Works in Fayetteville, North Carolina; and Chambers Works in Deepwater, New Jersey (collectively, the "Three Facilities"). PFAS are synthetic (man-made) chemicals that can harm human health and the environment. The Three Facilities have released, and continue to release, significant quantities of PFAS into the environment. Releases from the Three Facilities have affected the drinking water of tens of thousands of people in the areas near the Three Facilities. This action seeks substantial relief to control Defendants' PFAS pollution from the Three Facilities.

2.      This is a civil action for injunctive relief and civil penalties brought against Defendants The Chemours Company and The Chemours Company FC, LLC (collectively, "Chemours") pursuant to Sections 309(b) and (d) of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1319(b) and (d), and Section 22 of the West Virginia Water Pollution Control Act ("WPCA"), W. Va. Code § 22-11-22, for the illicit discharge of pollutants from the Three Facilities without authorization of, and in noncompliance with, a National Pollutant Discharge Elimination System ("NPDES") permit, in violation of the CWA and WPCA.

3.      This civil action also seeks injunctive relief under Section 17 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2616, for Chemours' violations of TSCA Sections 5 and 15, 15 U.S.C. §§ 2604 and 2614, relating to the use, processing, and manufacture of chemical substances subject to prohibitions, terms related to disposal, and notification requirements under Section 5 of TSCA, 15 U.S.C. § 2604, and its implementing regulations, 40 C.F.R. Parts 720 and 721.

4. This civil action also seeks injunctive relief and civil penalties under Section 3008(a) and (g) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928(a) and (g), for Chemours' violations of RCRA and the federally enforceable requirements of the hazardous waste programs of the States of North Carolina and New Jersey, arising from Chemours' generation and management of hazardous wastes at its facilities in Fayetteville, North Carolina and Deepwater, New Jersey.

## JURISDICTION, VENUE, AND NOTICE

5. This Court has jurisdiction over the subject matter of this action under Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b); Section 17(a) of TSCA, 15 U.S.C. § 2616(a); Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); and under 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental jurisdiction over the WVDEP claims alleged herein pursuant to 28 U.S.C. § 1367(a) because the WVDEP claims are so related to the federal claims as to form part of the same case or controversy. The Court has personal jurisdiction because Chemours operates in this district and transferred PFAS materials between and among the West Virginia facility and the facilities in New Jersey and North Carolina.

6. Venue is proper in the Southern District of West Virginia to 28 U.S.C. §§ 1391(b) and 1395(a), as well as Section 309(b) of the CWA, 33 U.S.C. § 1319(b); Section 17(a) of TSCA, 15 U.S.C. § 2616(a); Section 3008(a) of RCRA, and 42 U.S.C. § 6928(a), because it is a judicial district in which Chemours has been and/or is currently doing business.

7. Authority to bring this action is vested in the United States Department of Justice under Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. § 516.

8. Authority to bring this action on behalf of the State of West Virginia is vested in WVDEP under W. Va. Code §§ 22-11-7, 22-11-22.

3

9.     Notice of commencement of this action has been provided to the States of New Jersey, North Carolina, and West Virginia, pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and the States of New Jersey and North Carolina pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

## DEFENDANTS

10.     Defendant The Chemours Company is incorporated in Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19801. The Chemours Company was created as part of a 2015 corporate restructuring of E.I. du Pont de Nemours and Company, now known as EIDP, Inc. ("Old DuPont"). Old DuPont spun off a portion of its chemicals business, including PFAS-related operations, to The Chemours Company. On July 1, 2015, The Chemours Company became an independent company.

11.     Defendant The Chemours Company FC, LLC is incorporated in Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19801. The Chemours Company FC, LLC is a wholly owned subsidiary of The Chemours Company. The Chemours Company FC, LLC is the primary operating subsidiary of The Chemours Company in the United States.

12.     At all times relevant to this Complaint, Chemours has done business in the Southern District of West Virginia.

## STATUTORY AND REGULATORY BACKGROUND

### Clean Water Act

13.     Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

14.     To accomplish this goal, Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person to navigable waters except as in

compliance with, among other things, the terms and conditions of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

15.　Section 402(a) of the CWA, 33 U.S.C. § 1342(a), creates the NPDES program and provides that the permit-issuing authority may issue an NPDES permit that authorizes the discharge of any pollutant to navigable waters, but only in compliance with the applicable requirements of the CWA, and/or such other conditions as the EPA Administrator determines are necessary to carry out the provisions of the CWA.

16.　A state may establish its own NPDES program and, after receiving EPA approval, issue NPDES permits. 33 U.S.C. § 1342(b).

17.　When a state is authorized to administer an NPDES permit program, EPA retains concurrent authority to enforce violations of the Clean Water Act. 33 U.S.C. §§ 1319, 1342(i).

18.　Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

19.　Section 502(12) of the CWA, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

20.　Section 502(6) of the CWA, 33 U.S.C. § 1362(6), defines "pollutant" to include a wide variety of substances, including chemical waste, industrial waste, and solid waste.

21.　Section 502(7) of the CWA, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States."

22.　"Waters of the United States" has been further defined to include, among other things, "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," and tributaries of those waters. 40 C.F.R. § 122.2.

23.     Section 502(14) of the CWA, 33 U.S.C. § 1362(14), defines "point source" to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, [or] discrete fissure . . . from which pollutants are or may be discharged."

24.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the commencement of a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) of the CWA, 33 U.S.C. § 1311(a), or violates any permit condition or limitation in an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. *See also* 33 U.S.C. § 1319(a)(1), (a)(3).

25.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty payable to the United States.

26.     Pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note: Pub. L. 101-410, 104 Stat. 890 (enacted October 5, 1990)), the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701 note: Pub. L. 101-134, 110 Stat. 1321 (enacted April 26, 1996)), and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461, and as reflected in 40 C.F.R. § 19.4, the maximum CWA civil penalty is $37,500 per day for each violation occurring after January 12, 2009; and $68,445 per day for each violation occurring after November 2, 2015 (and assessed on or after January 25, 2025). *See also* 78 Fed. Reg. 66,643, 66,647 (Nov. 6, 2013); 90 Fed. Reg. 1375, 1377 (Jan. 8, 2025).

*West Virginia Water Pollution Control Act*

27.     Section 8 of the WPCA, W. Va. Code § 22-11-8, prohibits the discharge of any pollutant by any person into waters of the State of West Virginia, except, *inter alia*, in compliance with a West Virginia NPDES permit issued pursuant to the WPCA.

28.     Section 22 of the WPCA, W. Va. Code § 22-11-22, authorizes WVDEP to commence a civil action for injunctive relief to compel compliance with, and enjoin violations of, any provision of the WPCA or any term or condition of an NPDES permit issued under the WPCA. Section 22 of the WPCA also provides that any person who violates any provision of an NPDES permit issued pursuant to Section 8 of the WPCA, W. Va. Code § 22-11-8, is subject to a civil penalty of up to $25,000 per day for each violation.

*Toxic Substances Control Act*

29.     Congress enacted TSCA to promote the "develop[ment]" of "adequate information" about the "effect of chemical substances and mixtures on health and the environment" and to place that "responsibility" on the "manufacture[rs] and . . . process[ors]" of "such chemical substances and mixtures" and "to regulate chemical substances and mixtures which present an unreasonable risk of injury to health or the environment . . . ." 15 U.S.C. § 2601(b)(1)–(2).

30.     To achieve these goals, Section 15 of TSCA, 15 U.S.C. § 2614, makes it unlawful for any person to, among other things, (1) fail or refuse to comply with any requirement prescribed by any order or rule promulgated under Section 5, 15 U.S.C. § 2604; (2) use for commercial purposes a chemical substance or mixture which such person knew or had reason to know was manufactured, processed, or distributed in commerce in violation of Section 5, 15 U.S.C. § 2604; or (3) fail or refuse to establish or maintain records or to submit reports, notices, or other information as required by TSCA or its implementing regulations.

TSCA Premanufacture and Significant New Use Notifications

31.      EPA keeps current a list of each chemical substance manufactured or processed in the United States—known as the TSCA Inventory—in accordance with Section 8(b) of TSCA, 15 U.S.C. § 2607(b). Under TSCA Section 3(11), 15 U.S.C. § 2602(11), and 40 C.F.R. § 720.3(v), any chemical substance not included on the TSCA Inventory constitutes a "new chemical substance."

32.      Under Section 5(a)(1) of TSCA, 15 U.S.C. § 2604(a)(1), it is prohibited for any person to manufacture a new chemical substance, or manufacture or process a chemical substance for a significant new use, unless (1) that person submits a notice to EPA; (2) EPA reviews that notice; and (3) EPA makes a determination on that use under Section 5(a)(3) of TSCA, 15 U.S.C. § 2604(a)(3).

33.      The notifications required under Section 5(a)(1)(B) of TSCA, 15 U.S.C. § 2604(a)(1)(B), include Premanufacture Notifications ("PMNs") for new chemical substances and Significant New Use Notices ("SNUNs") for significant new uses of chemical substances. 15 U.S.C. § 2604(a)(1)–(2). EPA uses these notifications to determine whether the manufacture of a new chemical substance—or the manufacture or processing of a chemical substance for a significant new use—presents an unreasonable risk of injury to health or the environment and to appropriately regulate the manufacturing or processing under Section 5(e) or (f), 15 U.S.C. § 2604(e) or (f), to address unreasonable risk. 15 U.S.C. § 2604(a)(3).

34.      A PMN involves the manufacture of a new chemical substance. Pursuant to Section 5(a)(1)(A)(i) and (a)(1)(B) of TSCA, 15 U.S.C. § 2604(a)(1)(A)(i) and (a)(1)(B), a PMN must be submitted to EPA at least 90 days before manufacture of a new chemical substance.

8

PMNs must comply with the requirements of TSCA Section 5(d), 15 U.S.C. § 2604(d), and implementing regulations in 40 C.F.R. Part 720.

35.     Each person who submits a PMN must include the information specified in the notice form, such as "information concerning the environmental and health effects of such substance," to the extent it is known to or reasonably ascertainable by the submitter. 15 U.S.C. § 2604(d). *See also* 40 C.F.R. § 720.45. This information includes details about the "manufacture, processing, distribution in commerce, use, and disposal" of the new chemical substance. 15 U.S.C. § 2604(d)(1)(B); 40 C.F.R. § 720.45.

36.     A PMN must also identify the sites controlled by the submitter where the new substance will be manufactured, processed, or used. 40 C.F.R. § 720.45(g)(1). For each of those sites, the PMNs must include, among other things: "[w]orker exposure information, including worker activities, physical form of the new substance to which workers may be exposed, the number of workers, and the duration of activities" as well as "information on [the] release of the new substance to the environment, including the quantity and media of release and type of control technology used." 40 C.F.R. § 720.45(g)(3)–(4).

37.     Failure to comply with any provision of 40 C.F.R. Part 720 (Premanufacture Notification) is a violation of TSCA. 40 C.F.R. § 720.120; 15 U.S.C. § 2614.

38.     Pursuant to Section 5(a)(1)(A)(ii) and (a)(1)(B) of TSCA, 15 U.S.C. § 2604(a)(1)(A)(ii) and (a)(1)(B), a SNUN must be submitted to EPA at least 90 days before a person may manufacture or process any chemical substance for a use which EPA has determined is a significant new use.

39.     SNUNs must comply with the requirements of Section 5(d), 15 U.S.C. § 2604(d), and implementing regulations in 40 C.F.R. Part 721.

9

40.    Significant New Use Rules ("SNURs") define the significant new uses of chemical substances. EPA is authorized to promulgate SNURs for any significant new use of a chemical substance. 15 U.S.C. § 2604(a)(2).

41.    EPA identifies significant new uses of chemical substances and associated SNURs at 40 C.F.R. Part 721. *See* 15 U.S.C. § 2604(a)(2).

42.    The SNURs for hexafluoropropylene oxide ("HFPO") and the chemical substance identified by Chemical Abstract Service Registry Number ████████ (hereinafter, "Carbooxohalide") are relevant to the allegations in this Complaint.

43.    EPA promulgated the SNUR for HFPO at 40 C.F.R. § 721.4160 (1987), specifying that a significant new use for HFPO is "any new use other than as an intermediate in the manufacture of fluorinated substances in an enclosed process."

44.    EPA promulgated the SNUR for Carbooxohalide at 40 C.F.R. § 721.████, specifying that a significant new use for Carbooxohalide is the "manufacture, import, or processing of 10,000 pounds or more per year per facility for any use."

45.    Under 40 C.F.R. § 721.35, the failure to submit SNUNs for HFPO and Carbooxohalide in accordance with the requirements promulgated under Part 721 (Significant New Uses of Chemical Substances) is a violation of Section 15(1) of TSCA, 15 U.S.C. § 2614(1).

46.    After reviewing a PMN or SNUN, EPA can issue an order prohibiting or limiting the manufacture, processing, distribution in commerce, use, or disposal of a substance if EPA makes certain specified determinations. 15 U.S.C. § 2604(e)(1), (f)(3). These orders are known as Section 5(e) and 5(f) Orders.

47.     As relevant here, TSCA directs EPA to issue a Section 5(e) Order after determining that: (1) the information available is insufficient for a reasoned evaluation of a chemical substance's health and environmental effects; (2) without sufficient information for such an evaluation, the substance may present an unreasonable risk of injury to health or the environment; or (3) without sufficient information for an evaluation, the substance is or will be produced in substantial quantities that enter or may reasonably enter the environment, or there is or may be substantial human exposure to the substance. 15 U.S.C. § 2604(e)(1)(A).

48.     Failure to comply with a Section 5(e) Order is a violation of TSCA. 15 U.S.C. § 2614(1).

TSCA Definitions

49.     TSCA's implementing regulations define "person" to mean "any natural person, firm, company, corporation, joint-venture, partnership, sole proprietorship, association, or any other business entity, any State or political subdivision thereof, any municipality, any interstate body, and any department, agency or instrumentality of the Federal Government." 40 C.F.R. § 720.3(x).

50.     TSCA Section 3(9), 15 U.S.C. § 2602(9), defines "manufacture" as "to import into the customs territory of the United States . . . , produce, or manufacture."

51.     TSCA Section 3(13), 15 U.S.C. § 2602(13), defines "process" as "the preparation of a chemical substance or mixture, after its manufacture, for distribution in commerce . . . ."

52.     TSCA Section 3(2)(A)(i), 15 U.S.C. § 2602(2)(A)(i), defines "chemical substance" to include "any combination of such substances occurring in whole or in part as a result of a chemical reaction."

53.     As per 40 C.F.R. § 720.3(d), "byproduct" is defined "as any chemical substance or mixture produced without a separate commercial intent during the manufacture, processing, use, or disposal of another chemical substance or mixture."

TSCA Enforcement

54.     TSCA Section 17(a)(1), 15 U.S.C. § 2616(a)(1), authorizes the commencement of a civil action to restrain any violation of TSCA or compel the taking of any action required by TSCA.

*Resource Conservation and Recovery Act*

55.     Congress enacted RCRA, among other things, to "assur[e] that hazardous waste management practices are conducted in a manner which protects human health and the environment" and "require[s] that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date." 42 U.S.C. § 6902(a)(5)–(6).

56.     To achieve these goals, RCRA establishes a comprehensive "cradle-to-grave" program to be administered by EPA and authorized States for regulating the generation, transportation, treatment, storage, and disposal of hazardous waste. 42 U.S.C. §§ 6901–6992k.

57.     RCRA's Subchapter III (42 U.S.C. §§ 6921–6939) (also known as "RCRA Subtitle C"), requires EPA to promulgate regulations establishing performance standards for facilities that generate, transport, treat, store and/or dispose of hazardous wastes. Together, RCRA Subtitle C and its implementing regulations, set forth at 40 C.F.R. Parts 260–273 and 279, comprise EPA's RCRA hazardous waste program.

58.     EPA may, if certain criteria are met, authorize a state to operate a hazardous waste program in lieu of the federal hazardous waste program. Section 3006 of RCRA, 42 U.S.C. § 6926.

59.     EPA has granted final authorization to the State of North Carolina to carry out its own hazardous waste program in lieu of the federal hazardous waste program. *See* 49 Fed. Reg. 48694 (Dec. 14, 1984). The requirements of North Carolina's EPA-authorized RCRA hazardous waste program ("NC Hazardous Waste Program") are codified at N.C. Gen. Statutes ("N.C.G.S.") §§ 130A-17 to -28 and 130A-290 to -310.22, and in its implementing regulations (the North Carolina Hazardous Waste Management Rules) at 15A N.C. Admin. Code ("NCAC") 13A .0101-.0119.

60.     The NC Hazardous Waste Program incorporates by reference most of the federal regulations implementing RCRA Subtitle C. *See, e.g.*, 15A NCAC Subchapter 13A. Revisions to the NC Hazardous Waste Program were last authorized by EPA on October 10, 2019, and included adoption of the federal rules promulgated through June 30, 2017.  *See* 84 Fed. Reg. 54516 (Oct. 10, 2019).

61.     EPA has also granted final authorization, in two phases, to the State of New Jersey to carry out its own hazardous waste program in lieu of the Federal hazardous waste program. *See* 64 Fed. Reg. 41823 (Aug. 2, 1999); 67 Fed. Reg. 76995 (Dec. 16, 2002). The requirements of New Jersey's EPA-authorized RCRA hazardous waste program ("NJ Hazardous Waste Program") are codified at N.J. Admin. Code ("N.J.A.C.") § 7:26G-1, *et seq.* These regulations are contained in two notices published in the New Jersey Register. *See* 28 N.J.R. 4606 (Oct. 21, 1996); 31 N.J.R. 166 (Jan. 19, 1999).

62.     The NJ Hazardous Waste Program incorporates by reference 40 C.F.R. Parts 260–66, 268, and 270 but only as of July 31, 1998. Also, the NJ Hazardous Waste Program excludes from incorporation certain specified terms and provisions in the above-mentioned parts of the Code of Federal Regulations. *See* N.J.A.C. § 7:26G-1.4. The provisions of the NJ Hazardous

13

Waste Program at issue in this case were authorized by EPA in 1999 and incorporate the versions of the above-mentioned Parts of the Code of Federal Regulations set forth in the 1993 edition of the Code of Federal Regulations.

63.    Because the NJ and NC Hazardous Waste Programs (collectively, "Authorized State Hazardous Waste Programs") operate in lieu of the federal hazardous waste program, the citations herein to the applicable RCRA provisions will be to the respective Authorized State Hazardous Waste Programs; however, for ease of reference, the citations to the incorporated federal RCRA provisions will follow in brackets. *E.g.*, 15A NCAC 13A .0101 [40 C.F.R. Part 260 (2017)]; N.J.A.C. § 7:26G-4.1 [40 C.F.R. Part 260 (1993)].

64.    The provisions of the respective Authorized State Hazardous Waste Programs are federally enforceable upon notice to the States of North Carolina and New Jersey. *See* Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

Requirements of the Authorized State Hazardous Waste Programs

65.    As relevant here, under the Authorized State Hazardous Waste Programs, owners and operators of facilities that manage hazardous wastes must obtain a permit for each facility that treats, stores, or disposes of hazardous waste ("RCRA Permit") and only treat, store, or dispose of hazardous waste at such facility in accordance with the conditions of the RCRA Permit. 42 U.S.C. § 6925(a); 15A NCAC 13A .0109 [40 C.F.R. Part 264]; N.J.A.C. § 7:26G-12.1(a) and (d) [40 C.F.R. §§ 270.1 and 270.30 (1993)]. Alternatively, "large quantity generators" of hazardous waste may accumulate such waste onsite for 90 days or less without a permit or interim status, provided such generator complies with certain conditions listed in 40

C.F.R. § 261.4(a)(8) (2017) (as incorporated by 15 NCAC 13A.0107(a)) or 40 C.F.R.

§ 262.34(a) (1993) (as incorporated by N.J.A.C. 7:26G-6.1(a)), as applicable.

<u>The NC Hazardous Waste Program and Chemours' RCRA Permit at Fayetteville Works</u>

66.    Under the NC Hazardous Waste Program, Chemours is an owner and operator of a facility, namely, Fayetteville Works. 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)].

67.    Because Chemours has and continues to treat, store, or dispose of hazardous waste at Fayetteville Works, the NC Hazardous Waste Program has and continues to require Chemours to obtain a RCRA Permit for this facility and to comply with all conditions of such permit. *See* N.C.G.S. § 130A-294(c) and (g) [42 U.S.C. § 6925(a)]; 15A NCAC 13A.0113(f) [40 C.F.R. § 270.30(a) (2017)].

68.    On September 28, 2012, the North Carolina Department of Environmental Quality ("NCDEQ") issued a RCRA Permit (Permit No. NCD047368642-R2-M3) to Chemours for its Fayetteville Works facility ("FW RCRA Permit"). The FW RCRA Permit authorizes Chemours to manage hazardous waste management at Fayetteville Works consistent with the Permit's conditions. The FW RCRA Permit was last modified on July 1, 2015, and remained effective at least until September 8, 2022.

69.    At all relevant times, Paragraph I.A of the FW RCRA Permit (titled "Effect of Permit") has stated: "The Permittee is allowed to store and treat hazardous waste in accordance with the conditions of this permit."

70.    At all relevant times, Paragraph I.D.1 of the FW RCRA Permit (titled "Duties and Requirements") has stated: "The Permittee shall comply with all conditions of this permit, except to the extent and for the duration such noncompliance is authorized by an emergency permit issued under 40 C.F.R. § 270.61 as adopted in 15A NCAC 13A .0113. Any permit

15

noncompliance constitutes a violation of N.C. Hazardous Waste Management Rules and N.C.G.S. 130A-Article 9 (Solid Waste Management Act as amended)."

71. At all relevant times, no emergency permit issued under 40 C.F.R. § 270.61 has authorized noncompliance by Chemours with any relevant provision of the FW RCRA Permit.

72. At all relevant times, Paragraph II.C of the FW RCRA Permit has stated: "The Permittee shall not accept shipments of hazardous waste from off-site."

73. At all relevant times, Part III of the FW RCRA Permit has provided the requirements for storing hazardous waste in containers at Fayetteville Works. The provision defines the container storage area, i.e., the area in which containers storing hazardous waste containers are authorized, as follows: "The container storage area consists of a reinforced 5[-]inch thick concrete pad measuring 70 feet by 88 feet."

74. At all relevant times, Part IV of the FW RCRA Permit has provided the requirements for, among other things, storing hazardous waste in tanks at Fayetteville Works. The provision authorizes storage of hazardous waste in tanks in the following four designated waste storage tanks: VES Waste Fluorocarbon Storage Tank, Waste Fluorocarbon Storage Tank, Waste Fluorocarbon Reactor, and Waste DMSO Storage Tank. Under the NC Hazardous Waste Program, an LQG may lawfully accumulate hazardous waste on-site in containers or tanks for 90 days or less without a RCRA Permit if it complies with all applicable conditions set forth in 40 C.F.R. § 262.17 (2017) (as incorporated by NCAC 13A .0107(a)) ("NC LQG Permit Exemption"), including:

    i. Labeling containers and tanks accumulating hazardous waste with:

        1. the words "Hazardous Waste," 15A NCAC 13A .0107(a) [40 C.F.R. § 262.17(a)(5)(i)(A) (2017)]; and

16

2. an indication of the hazards of their contents, including any applicable hazardous waste characteristics, such as corrosivity, 15A NCAC 13A .0107(a) [40 C.F.R. § 262.17(a)(5)(i)(B) (2017)].

ii. If hazardous waste is placed in tanks, complying with applicable standards in 15A NCAC 13A .0110(j) [40 C.F.R. § 265.192 (2017)] for storing such waste, including that owners and operators of a tank system or component of such tank system (i.e., the tank or a tank system's ancillary equipment) that are used to store hazardous waste after July 14, 1986, must obtain a written assessment reviewed and certified by a qualified Professional Engineer ("PE") in accordance with 40 C.F.R. § 270.11(d) attesting that the tank system has sufficient structural integrity and is acceptable for storing and treating hazardous waste. 15A NCAC 13A .0107(a) [40 C.F.R. § 262.17(a)(5)(i)(A) (2017)].

iii. Complying with applicable standards to prepare for and prevent emergencies, 15A NCAC 13A .0107(a) [40 C.F.R. § 262.17(a)(6) (2017)], including having a contingency plan ("RCRA Contingency Plan") for the facility that is designed to minimize hazards to human health or the environment from fires, explosions, or any unplanned release of hazardous waste or hazardous waste constituents to air, soil, or surface water, 15A NCAC 13A .0107(i) [40 C.F.R. § 262.260(a) (2017)].

75. At all relevant times, Chemours claimed it qualified as an LQG at Fayetteville Works.

The NJ Hazardous Waste Program and Chemours' RCRA Permit at Chambers Works

76.     Under the NJ Hazardous Waste Program, Chemours is the owner and operator of a facility, namely, Chambers Works. NJAC. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

77.     Because Chemours has and continues to treat, store, or dispose of hazardous waste at Chambers Works, the NJ Hazardous Waste Program has and continues to require Chemours to obtain a RCRA Permit for this facility and comply with all conditions of such permit. *See* NJAC. 7:26G-12.1(a), (d) [40 C.F.R. § 270.1 (1993)].

78.     On May 13, 2010, NJDEP issued a RCRA Permit (Permit No. HWP140003) to Chemours for its Chambers Works facility ("CW RCRA Permit"). The CW RCRA Permit authorizes Chemours to manage hazardous waste at Chambers Works consistent with the Permit's conditions. The CW RCRA Permit became effective on August 9, 2009, with an expiration date of November 9, 2018. On or about May 10, 2018, Chemours submitted its initial application to NJDEP to renew its RCRA Permit, thereby extending the effectiveness of its CW RCRA Permit until a new permit or permit decision is issued. *See* N.J.A.C 7:26G-12 [40 C.F.R. 270.51 (1993)]; N.J.S.A 52:14B-11.

79.     Relevant here, Paragraph 81 of the CW RCRA Permit states that "[a] container holding hazardous waste must always be closed during storage, except when it is necessary to add or remove waste. [40 CFR 264.173(a)]."

80.     Under the NJ Hazardous Waste Program, an LQG may accumulate hazardous waste on-site in containers for 90 days or less without a RCRA Permit if it complies with all applicable conditions set forth in 40 C.F.R. § 262.34(a) (1993) (as incorporated by N.J.A.C. 7:26G-6.1(a)) ("NJ LQG Permit Exemption"), including:

   i.  Labeling containers accumulating hazardous waste with:

1.  the words "Hazardous Waste", N.J.A.C. § 7:26G-6.1(a) [40 C.F.R.

    § 262.34(a)(3) (1993)]; and

2.  the date upon which the period of accumulation of hazardous waste in the

    container begins, N.J.A.C. § 7:26G-6.1(a) [40 C.F.R. § 262.34(a)(2) (1993)].

ii.  Keeping containers holding hazardous waste closed except when it is necessary to add

    or remove waste, N.J.A.C. § 7:26G-6.1(a) [40 C.F.R. § 262.34(a)(1)(i) (1993)

    (referencing 40 C.F.R. § 265.173(a) (1993))].

81.     At all relevant times, Chemours claimed it qualified as an LQG at Chambers

Works.

## RCRA Definitions

82.     "Hazardous waste" is defined to include a "solid waste" or combination of "solid

wastes" that can cause or significantly contribute to an increase in mortality or serious illness or

pose a substantial present or potential hazard to human health or the environment when

improperly treated stored, transported, disposed of, or otherwise managed. RCRA Section

1004(5), (27), 42 U.S.C. § 6903(5), (27).

83.     Hazardous waste includes solid wastes that exhibit certain characteristics, such as

corrosivity and toxicity. 15A NCAC 13A .0106(c) [40 C.F.R. §§ 261.21-24 (2017)]. Hazardous

waste also includes solid wastes that are listed in 40 C.F.R. Part 261, Subpart D and not excluded

from that Subpart. 15 NCAC 13A.0106(d) [40 C.F.R. Part 261, Subpart D (2017); N.J.A.C

7:26G-5.1(a) [40 C.F.R. § 261.3 (1993)].

84.     A "solid waste" is "any discarded material that is not excluded" from the

regulations implementing RCRA. 15 NCAC 13A .0106(a) [40 C.F.R. § 261.2 (2017)]; N.J.A.C.

§ 7:26G-5.1(a) [40 C.F.R. § 261.2 (1993)].

85. A "person" is defined by the NC Hazardous Waste Program as "an individual, corporation, company, association, partnership, unit of local government, State agency, federal agency or other legal entity" and by the NJ Hazardous Waste Program as "an individual, trust, firm, joint stock company, Federal Agency, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body." N.C.G.S. § 130A-290(a)(22); 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

86. A "container" is defined as "any portable device in which a material is stored, transported, treated, disposed of, or otherwise handled." 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

87. A "facility" is defined to include all contiguous land and structures used for treating, storing, or disposing of hazardous waste. 15A NCAC 13A. 0102 [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

88. An "owner" is defined as "the person who owns a facility or part of a facility." 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

89. An "operator" is defined as "the person responsible for the overall operation of a facility." 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

90. A "generator" is defined as "any person, by site, whose act or process produces hazardous waste identified or listed" in 40 C.F.R. § 261. 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

91.     A "large quantity generator" ("LQG") is a generator that generates, among other things, either of the following amounts in a calendar month at a given facility:

a.      At least 1,000 kilograms of non-acute hazardous waste; or

b.      At least 1 kilogram of acute hazardous waste listed in 40 C.F.R. §§ 261.31 or .33(e), which are part of Subpart D. 15A NCAC 13A. 0102 [40 C.F.R. § 260.10 (2017)]; N.J.A.C. § 7:26G-6.1(a) [40 C.F.R. § 262.34 (1993)].

92.     Under the NC Hazardous Waste Program, "storage" means the containment of solid waste, either on a temporary basis or for a period of years, in a manner which does not constitute disposal. N.C.G.S. § 130A-290(a)(41).

93.     Under the NJ Hazardous Waste Program, "storage" means "the holding of hazardous waste for a temporary period, at the end of which hazardous waste is treated, disposed of, or stored elsewhere." N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

94.     A "tank" is defined as a stationary device, designed to contain an accumulation of hazardous waste which is constructed primarily of non-earthen materials which provide structural support. 15A NCAC 13A. 0102(b) [40 C.F.R. § 260.10 (2017)].

95.     "Leachate" is defined as "any liquid, including any suspended components in the liquid, that has percolated through or drained from hazardous waste." N.J.A.C. § 7:26G-4.1(a) [40 C.F.R. § 260.10 (1993)].

RCRA Enforcement

96.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), authorizes the United States to enforce the provisions of the Authorized State Hazardous Waste Programs after providing notice to the respective States by instituting a civil action to obtain appropriate relief, including a

temporary or permanent injunction, against any person who has violated or is in violation of any requirement of RCRA.

97.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), provides that any person who violates any requirement of RCRA is liable to the United States for a civil penalty for each such violation. Each day of such violation constitutes a separate violation.

98.    Under Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), as amended by the Federal Civil Penalties Inflation Adjustment Act of 1990, the Debt Collection Improvement Act of 1996, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, and as reflected in 40 C.F.R. § 19.4, the maximum RCRA civil penalty is $90,702 per day for each violation occurring after November 2, 2015, and assessed on or after December 27, 2023. *See also* 78 Fed. Reg. 66,643, 66,647 (Nov. 6, 2013); 88 Fed. Reg. 89,309 (Dec. 27, 2023).

## GENERAL ALLEGATIONS

### *PFAS*

99.    PFAS are a family of synthetic chemical compounds containing fluorine and carbon atoms bonded together.

100.    As relevant here, PFAS enter the environment through releases to land, air, and water from industrial facilities that produce or use PFAS or generate PFAS as a byproduct during the manufacture of other products.

101.    Humans can be exposed to PFAS through a variety of pathways, including but not limited to, drinking contaminated water, consuming certain foods containing PFAS, and inhaling contaminated soil or dust.

102.    PFAS can pose adverse health risks to humans and other living organisms.

22

103.    Appendix A of this Complaint includes the name and acronym of PFAS compounds referenced in this Complaint. One of the PFAS is PFOA.[2]

*2008 Premanufacture Notice*

104.    Prior to 2009, GenX was a new chemical substance as defined under TSCA. For purposes of this Complaint, the term "GenX" includes two chemical substances that Chemours currently manufactures: (1) HFPO Dimer Acid (CAS # 13252-13-6), also known as HFPO-DA, C3 Dimer Acid, P-08-508, GX903, C3DA, or FRD 903; and (2) HFPO Dimer Acid Ammonium Salt (CAS # 62037-80-3), also known as ammonium salt of C3 Dimer Acid, P 08 509, GX902, or FRD 902.

105.    Before Old DuPont could lawfully begin manufacturing GenX, it was required to submit a PMN under TSCA with details on its proposed manufacture.

106.    On June 30, 2008, Old DuPont submitted a PMN for GenX covering HFPO-DA (PMN Number P-08-508) and its ammonium salt (PMN Number P-08-509) (together, "2008 PMN").

107.    In Part II of the 2008 PMN, Old DuPont included "Human Exposure and Environmental Release" information detailing how environmental releases and disposal would be addressed at each facility where GenX would be manufactured, processed, or used, including at the following facilities: ███████████████████████████████████ ████████████████████████████████.

108.    Based on the facility-specific environmental release and disposal information that Old DuPont submitted in the 2008 PMN, EPA conducted a risk assessment. Among other risk-

---

[2] "PFOA" refers to both the compound's acid form and its related salt form (ammonium perfluorooctanoate or "APFO"). APFO is an ammonium salt of perfluorooctanoic acid. APFO is highly soluble and breaks down into PFOA in the environment.

related considerations, the risk assessment assessed anticipated air emissions and water discharges at each facility identified in Part II of the 2008 PMN.

109.    The 2008 PMN also specified that Old DuPont would manufacture GenX by

████████████████████████████████████████████████████████████████

███████████████ .

110.    In 2008, when Old DuPont submitted the 2008 PMN, Old DuPont also discharged HFPO-DAF from the Nafion™ ("Nafion") process into wastewater treatment.

111.    Under applicable regulations, the 2008 PMN should have included, among many other details, information on worker exposure to GenX as well as information on any GenX releases "to the environment, including the quantity and media of release and type of control technology used." 40 C.F.R. § 720.45(g)(4). *See generally* 40 C.F.R. § 720.45.

112.    The 2008 PMN neither identified nor described any potential worker exposure to GenX related to HFPO-DAF releases from the Nafion process.

113.    Nor did the 2008 PMN identify that the Nafion process was a point of release to the environment of GenX, which hydrolyzes from HFPO-DAF during wastewater treatment.

114.    After reviewing the 2008 PMN, EPA concluded that the submissions were insufficient to determine the potential for human health and environmental effects from GenX, and, pursuant to TSCA Section 5(e)(1)(A)(ii)(I), 15 U.S.C. § 2604(e)(1)(A)(ii)(I), that uncontrolled manufacture, import, processing, distribution, use, and disposal of GenX may present an unreasonable risk of injury to human health and the environment.

*GenX 5(e) Order*

115.    In January 2009, EPA and Old DuPont agreed to a Section 5(e) Consent Order ("GenX 5(e) Order") setting certain limits on GenX releases, among other requirements.

24

116. The GenX 5(e) Order includes a provision that establishes release restrictions for GenX. Titled "Control of Effluent & Emissions," this provision required Old DuPont—and subsequently Chemours—to "recover and capture (destroy) or recycle the PMN substances at an overall efficiency of 99% from all the effluent process streams and the air emissions (point source and fugitive)." ("GenX 99% Restriction").

117. Chemours manufactures, processes, distributes in commerce, uses, or disposes of GenX subject to the GenX 5(e) Order ("Subject GenX") at the following facilities, which are therefore subject to the GenX 99% Restriction: Chambers Works in Deepwater, New Jersey; Fayetteville Works; Washington Works; and Parlin.

118. Under Section III of the GenX 5(e) Order, Chemours must maintain specified records for at least 5 years after the date they are created, including "[r]ecords documenting compliance with the Control of Effluent & Emissions" provision in the Order. GenX 5(e) Order III(a)(9) ("Recordkeeping Provision for the GenX 99% Restriction").

119. Chemours uses a "mass balance model" in its effort to comply with the Recordkeeping Provision for the GenX 99% Restriction.

120. Chemours' mass balance model generates ▮▮▮▮▮ that is meant to show whether Chemours is complying with the GenX 99% Restriction. The ▮▮▮▮▮ represents the ▮▮▮▮▮ of Subject GenX that Chemours estimates ▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮ of Subject GenX, while ▮▮▮▮▮ provides the ▮▮▮▮▮ of Subject GenX that Chemours calculates ▮▮▮▮▮ of Subject GenX that Chemours estimates ▮▮▮▮▮ The ▮▮▮▮▮ can be ▮▮▮▮▮



121.   If the mass balance model ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, then Chemours claims the model ▮▮▮▮▮▮▮▮▮▮▮▮▮ of Subject GenX and, as a result, that it satisfies the 99% Restriction. Conversely, ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ then the model would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of Subject GenX and is therefore violating the 99% Restriction.

*The Mass Balance Model's Estimates of Chemours' Releases of Subject GenX Conflict with Real-World Sampling and Monitoring Data from Chemours' Facilities*

122.   The mass balance model does not use actual data, such as emissions and discharge data, to determine if Chemours is complying with the 99% Restriction.

123.   Rather than use actual data, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the mass balance model rely on a set of engineering assumptions and equations to determine the amount of Subject GenX in Chemours' releases and products across Chemours' operations at all domestic facilities that manufacture, process, distribute in commerce, use, or dispose of Subject GenX.

124.   Actual sampling and monitoring of Chemours' releases of Subject GenX show that Chemours' model has underrepresented such releases.

125.   Real-world sampling data also shows that Chemours' mass balance model has overestimated the amount of Subject GenX that is destroyed by certain controls.

126.   Chemours has not modified its mass balance model despite actual monitoring data showing that the model can underreport releases of Subject GenX and overestimate the amount of GenX destroyed by pollution controls.

*The Mass Balance Model Relies on Unsubstantiated, Unrepresentative, and Flawed Engineering Assumptions and Equations to Calculate Compliance with the 99% Restriction*

127. The mass balance model, including its underlying engineering assumptions and equations, was originally developed by Old DuPont.

128. Chemours cannot explain how Old DuPont derived the engineering assumptions underlying the mass balance model.

129. Chemours asserts that the equations underlying the mass balance model are derived from unspecified experimental data from Old DuPont that it cannot explain or replicate.

130. Chemours has not substantiated multiple assumptions and equations specific to GenX processes used in the model.

131. Because Chemours cannot explain the assumptions and equations used in the mass balance model and has failed to substantiate them, Chemours cannot show that its records demonstrate and document compliance with the GenX 99% Restriction.

132. Also, the engineering assumptions and equations underlying the mass balance model are not representative of the actual amounts of Subject GenX released and in products.

133. Chemours assumes that the amount of Subject GenX ███████████████ ████ is constant. But the amount of Subject GenX in ███████████████████████ is variable.

134. Thus, Chemours' assumption as to the amount of Subject GenX █████████ is not representative of its actual production and use of Subject GenX.

135. In turn, Chemours' assumption in its mass balance model as to its fugitive emissions of Subject GenX is not representative of its actual fugitive emissions of Subject GenX.

136. Another example of a flaw in the mass balance model is how Chemours calculates the sum of Subject GenX ████████████████████████ in the mass balance █████.

27

137.    By using a model with unsubstantiated and flawed assumptions and equations, Chemours cannot determine—and has failed to accurately document—whether it actually controls at least 99% of its releases of Subject GenX.

138.    Consequently, Chemours cannot adequately evaluate whether it needs to adjust its equipment, processes, or controls to further prevent releases of Subject GenX.

*The Mass Balance Model Fails to Account for Changes in Chemours Facilities' Manufacturing, Processing, Use, Disposal, and Control of Subject GenX that Would Affect the Engineering Assumptions and Equations Used to Calculate Releases of Subject GenX*

139.    In order to accurately document compliance with the 99% Restriction, any model used by Chemours would need to be revised whenever a facility's operations change in a manner that would affect the model's assumptions and equations in order to reflect process changes for any activities involving Subject GenX.

140.    Since assuming the GenX 5(e) Order, Chemours has made changes to its processes involving Subject GenX.

141.    An example of one such process change is the addition of water discharge points for GenX processing at Washington Works.

142.    Despite adding water discharge points for GenX processing at Washington Works, Chemours has not updated the equations or assumptions in its mass balance model to reflect these additional water discharge locations that may contain Subject GenX.

143.    Chemours' mass balance model, which was fundamentally flawed from its inception, is thus also outdated.

*Fayetteville Works, North Carolina*

Fayetteville Works Ownership and Operations

144.    Fayetteville Works is an industrial gas, plastics, and resin chemicals manufacturing facility located at 22828 NC Highway 87 West, Fayetteville, North Carolina

28

28306. The facility produces fluorinated monomers, fluorinated vinyl ethers, ion exchange membranes, and fluoropolymer processing aids, among other products.

145.    Fayetteville Works sits adjacent to the Cape Fear River in southeast North Carolina on approximately 2,150 acres.

146.    Fayetteville Works is near residential communities in Bladen and Cumberland counties. The City of Fayetteville, which has a population of approximately 210,000, is 17 miles away, and Wilmington, North Carolina, which has a population of approximately 120,000, is 100 miles downstream.

147.     Chemours has owned and operated Fayetteville Works since 2015.

148.    Fayetteville Works has five manufacturing areas: (1) the IXM Monomers area, formerly called the Nafion area; (2) the PPA area; (3) the Butacite™ ("Butacite") area; (4) the SentryGlas™ ("SentryGlas") area; and (5) a polyvinyl fluoride ("PVF") resin area.

149.    Fayetteville Works also includes a hazardous waste central accumulation area, a RCRA permitted container storage area, and four RCRA permitted storage tanks.

150.    Chemours operates the Nafion manufacturing area and the PPA manufacturing area. Two tenant companies operate the remaining manufacturing areas at Fayetteville Works.

151.    Chemours manufactures, among other products, ion exchange membranes and fluorinated products like FLPR vinyl ether monomers and HFPO monomers at the Nafion manufacturing area. The Nafion manufacturing area came online in 1980.

<u>PFAS Use and Manufacturing at Fayetteville Works</u>

152.    Chemours has admitted that PFAS "are present" and "have been present" in various operations at Fayetteville Works, including PFOA.

29

153.    Chemours has identified 24 PFAS analytes that are or were associated with Fayetteville Works operations.

154.    Upon information and belief, subject to a reasonable opportunity for further investigation or discovery, operations at Fayetteville Works use or have used PFAS, including PFOA and PFOS, in addition to the manufacturing of Teflon in the PMDF Area and the manufacturing of APFO in the PPA Area.

155.    Since taking over ownership and operations at Fayetteville Works, Chemours has continued to manufacture GenX at the PPA manufacturing area.

156.    Fayetteville Works is the only facility where Chemours manufactures GenX as a product.

157.    Process wastewater from the PPA manufacturing area is captured and disposed of off-site.

158.    Operations at the Nafion manufacturing area generate HFPO Dimer Acid Fluoride. In the presence of water and other compounds, HFPO Dimer Acid Fluoride hydrolyzes into C3 Dimer Acid and its salts, i.e., GenX.

159.    After July 2015 and through at least November 2017, Chemours discharged Nafion process wastewater to the Cape Fear River via a terracotta pit and a series of outfalls.

<u>HFPO Manufacturing at Fayetteville Works</u>

160.    Chemours uses HFPO (CAS 428-59-1) to generate HFPO Dimer Acid Fluoride, which is then used to manufacture GenX.

161.    HFPO is subject to a SNUR that limits any use of HFPO to an "enclosed process," meaning "a process that is designed and operated so that there is no intentional release of any substance present in the process." 40 C.F.R. § 721.4160(b)(1)(i). The HFPO SNUR further

30

clarifies that "[a] process with fugitive, inadvertent, or emergency relief releases remains an enclosed process so long as measures are taken to prevent worker exposure to and environmental contamination from the releases." *Id.* Any use not consistent with an enclosed process constitutes a significant new use of HFPO.

162.    During the HFPO manufacturing process, Chemours also produces Carbooxohalide.

163.    Chemours has manufactured at least 10,000 pounds annually of Carbooxohalide in multiple years.

164.    Chemours then processes Carbooxohalide in the production of two other chemical substances: PMVE and PEPF/PEVE.

### Fayetteville Works Effluent and Receiving Waterways

165.    Fayetteville Works employs a series of internal and external outfalls to convey wastewater and stormwater to the Cape Fear River.

166.    The Cape Fear River is a traditional navigable water and is navigable-in-fact.

167.    The Cape Fear River has been designated by the U.S. Army Corps of Engineers as a jurisdictional waterway under the Rivers and Harbors Act. 33 U.S.C. §§ 403, 1362(7); 40 C.F.R. § 120.2(a).

168.    One of the wastewater treatment plants that Chemours owns and operates receives and treats process wastewater, sanitary wastewater, and contact stormwater at Fayetteville Works.

169.    Treated water from the wastewater treatment plant discharges through Outfall 001, which is an internal outfall at Fayetteville Works. Effluent from Outfall 001 then travels to Outfall 002, which discharges to the Cape Fear River.

31

170.    Non-contact cooling waters and stormwater—including those waters from two tenants' operations—are also discharged through Outfall 002.

171.    In June 2012, Old DuPont relocated Outfall 002 upstream to address erosion along the channel of the Outfall's original location. For purposes of this Complaint, the conveyance at the original location of the Outfall is known as "Old Outfall 002."

172.    Old Outfall 002 continued to discharge contaminated surface water, stormwater, and groundwater to the Cape Fear River after the 2012 relocation. Old Outfall 002 was a natural drainage conveyance—it was neither lined nor piped.

173.    Under a 2019 Consent Order with NCDEQ, Chemours was required to collect and treat the contaminated dry baseflow, groundwater, and stormwater that ran through Old Outfall 002. Chemours has been treating these flows since 2020, when Old Outfall 002 was redesignated as Outfall 003 and issued an NPDES permit.

174.    Sampling campaigns between 2005 and 2019 indicate that PFAS, including GenX, were present in effluent discharged from Outfall 001, Outfall 002, and Old Outfall 002.

175.    From 2004 to 2022, Old Dupont and Chemours surface water sampling downstream of Fayetteville Works detected PFOA and PFOS discharges to the Cape Fear River, with PFOA concentrations of 42,000 – 49,000 ppt and PFOS concentrations of 40,000 – 44,000 ppt in 2021.

176.    Stormwater discharge sampling from 2019 to 2022 detected PFOA and PFOS, with a maximum PFOA concentration of 1,800,000 ppt and a maximum PFOS concentration of 84 ppt.

177.    During the years relevant to this Complaint, sources of PFAS, including GenX, PFOA, and PFOS, in effluent discharged from Fayetteville Works, have included the Monomer

IXM Area which includes the Nafion manufacturing area, stormwater runoff, groundwater infiltration, residual contamination, and air deposition.

178.    Since November 29, 2017, Chemours has been collecting and continues to collect the process wastewater from its manufacturing areas (i.e., the PPA area and the Nafion manufacturing area) into tanks and sumps. After the process wastewater is collected, it is transported by truck for disposal off-site.

<u>Fayetteville Works NPDES Permits</u>

179.    The State of North Carolina, through NCDEQ, has been authorized to administer the NPDES program in North Carolina since October 19, 1975.

180.    NCDEQ was known as the North Carolina Department of Environment and Natural Resources until approximately 2016. For purposes of this Complaint, NCDEQ refers to both the North Carolina Department of Environmental Quality and the North Carolina Department of Environment and Natural Resources.

181.    Pursuant to its authority to administer the NPDES program, NCDEQ first issued NPDES Permit No. NC0003573 to Old DuPont in October 1977.

182.    NPDES Permit No. NC0003573 has been renewed and modified numerous times.

183.    On May 25, 2007, NCDEQ renewed NPDES Permit No. NC0003573 with an effective date of July 1, 2007 ("2007 FW NPDES Permit"). The 2007 FW NPDES Permit authorized discharges of wastewater and stormwater from Outfall 001 and Old Outfall 002.

184.    The 2007 FW NPDES Permit introduced a PFOA monthly monitoring requirement for discharges from Old Outfall 002. The Permit did not otherwise mention or authorize discharges of any PFAS.

185.   NCDEQ issued a renewed NPDES Permit No. NC0003573 on February 6, 2012 ("2012 FW NPDES Permit").

186.   The 2012 FW NPDES Permit required monthly PFOA monitoring for Outfall 002, which Old DuPont relocated in June 2012. The Permit did not otherwise mention or authorize discharges of any PFAS.

187.   The 2012 FW NPDES Permit was transferred from Old DuPont to Chemours in NPDES Permit No. NC0003573 on October 28, 2015, with an effective date of July 1, 2015 ("2015 FW NPDES Permit").

188.   The 2015 FW NPDES Permit requires monthly PFOA monitoring for Outfall 002. The Permit does not otherwise mention or authorize discharges of any PFAS.

189.   Although Chemours submitted renewal applications for the 2015 FW NPDES Permit in 2016, 2019, 2020, and 2021, the 2015 FW NPDES Permit remains the operative permit for Outfalls 001 and 002.

190.   Chemours' April 2016 renewal application made no mention of PFAS in the Nafion process wastewater discharged through Outfalls 001 and/or 002.

191.   In 2015, a scientific paper published by researchers—including EPA scientists—revealed elevated levels of GenX and other PFAS in the Cape Fear River. News outlets reported the findings and garnered public attention.

192.   On November 30, 2017, NCDEQ partially suspended the 2015 FW NPDES Permit, citing Chemours' "misrepresentations and inadequate disclosures about GenX and other chemicals" in discharges from Fayetteville Works. The suspension applied to Permit provisions that had authorized process wastewater discharges from the Nafion manufacturing area.

193.    Chemours severed the pipe that carried process wastewater from the Nafion manufacturing area to Outfall 002 on November 29, 2017—one day before the 2015 FW NPDES Permit suspension took effect.

194.    Pursuant to a 2019 Consent Order with NCDEQ, Chemours continues to be prohibited from discharging process wastewater from Fayetteville Works until an NPDES permit that expressly authorizes those discharges is issued.

195.    NCDEQ has issued two subsequent NPDES Permits authorizing discharges of treated baseflow, groundwater, and stormwater from Old Outfall 002 (NPDES Permit No. NC0089915) and discharges of treated groundwater from Outfall 004 (NPDES Permit No. NC0090042).

196.    NPDES Permit No. NC0089915 became effective on September 30, 2020 ("2020 FW NPDES Permit"). The Permit designates Old Outfall 002 as Outfall 003. It requires treatment of the contaminated dry baseflow that ran through Old Outfall 002. The Permit also imposes numerical effluent limits, monitoring and reporting effluent limits, and monitoring requirements for HFPO-DA, PMPA, and PFMOAA, as well as monitoring requirements for approximately 56 other PFAS compounds. Chemours must remove HFPO-DA, PMPA, and PFMOAA from the Outfall 003 effluent at an efficiency of at least 99%.

197.    The permit covering Outfall 004 (NPDES Permit No. NC0090042) became effective on November 1, 2022 ("2022 FW NPDES Permit"). Like the 2020 FW NPDES Permit, the 2022 Permit sets numerical effluent limits, monitoring and reporting effluent limits, and monitoring requirements for HFPO-DA, PMPA, and PFMOAA, all of which must be removed at an efficiency of at least 99%. The 2022 Permit also requires monitoring and sampling for 52 other PFAS compounds.

Unauthorized PFAS Discharges at Fayetteville Works

198.    Beginning with its startup in 1980, operations in the Nafion manufacturing area generated C3 HFPO Dimer Acid Fluoride and C3 Dimer Acid as byproducts. Those compounds appeared in wastewater sent from the Nafion manufacturing area to the wastewater treatment plant, or that bypassed the wastewater treatment plant, and were ultimately discharged as HFPO-DA into the Cape Fear River.

199.    Chemours never specified their discharges of HFPO-DA related to the Nafion manufacturing area in renewal applications for the 2012 FW NPDES Permit, the 2015 FW NPDES Permit, or the April 2016 renewal application.

200.    Chemours was aware that the Nafion manufacturing area discharged wastewater containing HFPO-DA and other fluorinated chemicals.

201.    Surface water sampling taken between 2015 and 2019 at and near Fayetteville Works has consistently revealed the presence of PFAS other than PFOA.

202.    In August 2014, NCDEQ noted "some evidence" of PFAS other than PFOA, including PFBA, PFPeA, and PFHpA, in discharges from Fayetteville Works.

203.    In 2016, researchers, including scientists from EPA's Office of Research and Development, published the results of 2012, 2013, and 2014 surface water sampling in the Cape Fear River near Fayetteville Works. Those sampling activities detected the presence of HFPO-DA, PFMOAA, PFO2HxA, PFESA_BP2, PFO3OA, and PFO4DA.

204.    Between June 14, 2017, and December 6, 2018, Chemours sampled its water discharges from Outfall 002 for a range of PFAS other than PFOA. The sampling detected PFAS other than PFOA, including HFPO-DA, PFPeA, PFBA, PFHpA, PFHxA, PFOS, PFNA, PFMOAA, PFO2HxA, PFHxS, and PFBS, on at least 178 instances. Many of these PFAS were

36

discharged after Chemours severed the pipe that had carried process wastewater from the Nafion manufacturing area to Outfall 002 in November 2017.

205.    Between January 16, 2018, and June 14, 2018, Chemours again sampled its water discharges from Old Outfall 002 for a range of PFAS other than PFOA. The sampling detected PFAS other than PFOA, including HFPO-DA, PFPeA, PFBA, PFHpA, PFOS, PFNA, PFMOAA, PFO2HxA, PFBS, PFO3OA, PFO4DA, PFO5DoA, and PFESA_BP2, on at least 40 instances.

<u>EPA's 2017 TSCA Inspection at Fayetteville Works</u>

206.    From June 28–29, 2017, EPA conducted an on-site inspection at Fayetteville Works to assess Chemours' compliance with TSCA ("2017 FW Inspection").

207.    Following the 2017 FW Inspection, EPA reviewed data on HFPO emissions from Fayetteville Works. According to data submitted to the NCDEQ Division of Air Quality, Fayetteville Works released approximately 255,732 pounds of HFPO between 2012 and 2016. The data showed the following emissions per year: 35,140 pounds in 2012; 55,531 pounds in 2013; 50,362 pounds in 2014; 72,585 pounds in 2015; and 42,114 pounds in 2016.

208.    Data submitted to EPA as part of a June 2018 report on facility-wide HFPO emissions likewise showed that Fayetteville Works released 58,318 pounds of HFPO in 2017.

209.    After the 2017 FW Inspection, EPA submitted information requests to Chemours to obtain information on the manufacture and processing of Carbooxohalide at Fayetteville Works.

210.    On March 29, 2018, Chemours provided data to EPA on the amount of

████████████████████████████████████████ at Fayetteville Works. According to

37

that data, Fayetteville Works manufactured more than 10,000 pounds of Carbooxohalide in 2015, 2016, and 2017.

### Shipments of Hazardous Waste to Fayetteville Works

211.    On October 28, 2018, EPA received from Chemours Netherlands B.V. ("Chemours Netherlands") a notice of Chemours Netherlands's intent to export to Fayetteville Works spent "fluorine-containing surfactant FRD-902 NL" from its facility in the Netherlands. Chemours Netherlands submitted this notice pursuant to 40 C.F.R. § 262, Subpart H, which requires a person seeking to engage in transboundary movements of hazardous waste to both notify EPA and receive authorization from the agency before doing so.

212.    In response to Chemours Netherlands's notice referenced in the preceding Paragraph, EPA issued a Notice of Temporary Objection on December 19, 2018, and requested further information from Chemours Netherlands regarding its proposed export into the United States of spent fluorine-containing surfactant FRD-902 NL. EPA issued a final Notice of Objection on January 6, 2020. There, the agency repeated its objection to Chemours Netherlands's notice received on October 28, 2018, of the company's intent to export to Fayetteville Works fluorine-containing surfactant FRD-902 NL.

213.    In response to EPA's Notice of Temporary Objection and final Notice of Objection, Chemours and Chemours Netherlands provided EPA with information regarding shipments that Fayetteville Works had received from Chemours Netherlands. This information shows that, on at least two occasions in 2017 and 2018, Chemours received shipments at Fayetteville Works from Chemours Netherlands of fluorine-containing surfactant FRD-902 NL that exhibited hazardous waste characteristics.

214.   The fluorine-containing surfactant FRD-902 NL that Chemours received at Fayetteville Works from Chemours Netherlands is a chemical that exhibits the characteristic of corrosivity. It is thus a hazardous waste under the NC Hazardous Waste Program. 15A NCAC 13A .0106 [40 C.F.R. §§ 261.21-261.24 (2017)].

<u>EPA's 2019 Inspection at Fayetteville Works</u>

215.   From April 2–10, 2019, EPA, along with NCDEQ, conducted an on-site inspection at Fayetteville Works to assess Chemours' compliance with the CWA and RCRA ("2019 FW Inspection").

216.   The 2019 FW Inspection involved, among other things, review of the process areas and waste and wastewater management and treatment areas. EPA also collected samples, reviewed records, and interviewed Chemours personnel.

217.   During the 2019 FW Inspection, on April 8, 2019, EPA sampled discharges from Old Outfall 002 during an on-site inspection. Those samples detected numerous PFAS other than PFOA, including HFPO-DA, PFBA, PFDA, PFDoA, PFHpA, PFHxA, PFNA, PFPeA, 3,6-OPFHpA, PFBS, PFHpS, and PFHxS.

218.   EPA also sampled Outfall 002 during the on-site inspection on April 8, 2019. Those samples detected PFAS other than PFOA, including HFPO-DA, PFBA, PFDA, PFHpA, PFHxA, PFNA, PFPeA, N-EtFOSAA, PFBS, PFHxS, PFOS, PFPeS, and 6:2 FTS.

219.   The date, location, pollutant, and amount detected for samples taken between June 2017 and April 2019, as alleged in Paragraphs 215 to 218, are listed in Appendix B, Table 1 of this Complaint.

220. During the 2019 FW Inspection, on April 8, 2019, EPA observed three containers (two polymer 55-gallon drums and one manufacturing lab container) located in central accumulation areas at Fayetteville Works.

221. The three containers referenced in the preceding Paragraph each collected wastewater from, at least, the Nafion process. Each of these containers was accumulating solid waste that exhibited the characteristic of corrosivity (designated hazardous waste code: D002). Thus, the solid waste in these containers constituted hazardous waste. 15A NCAC 13A .0106 [40 C.F.R. § 261.22 (2017)].

222. Under the FW RCRA Permit, the central accumulation areas at Fayetteville Works where the three containers referenced in the preceding Paragraphs were located are outside of the area where Chemours is authorized to store hazardous waste in containers.

223. During the 2019 FW Inspection, on April 9, 2019, EPA observed eight tanks on-site—(1) a common waste tank, (2) products sump, (3) vinyl ether-North sump, (4) hydrolysis sump, (5) a waste acid tank, (6) waste alkaline tank, and (7–8) wastewater retention tanks 1 and 2—storing solid waste that EPA has determined exhibit the hazardous waste characteristic of corrosivity or otherwise stored solid waste that constitutes hazardous waste.

224. Under the FW RCRA Permit, none of the eight tanks referenced in Paragraph 223 were among the tanks in which Chemours is authorized to store hazardous waste.

225. On April 8, 2019, EPA determined that Chemours failed to label the three containers referenced in Paragraph 220 with an indication of the hazards of their contents.

226. On April 9, 2019, EPA observed that the eight tanks referenced in Paragraph 223 did not have a label with an indication of the hazards of their contents.

227.    On April 9, 2019, EPA observed that four of the tanks referenced in Paragraph 223 (a common waste tank, products sump, vinyl ether-North sump, and hydrolysis sump) were not labeled with the words "Hazardous Waste."

228.    The 2019 FW Inspection determined that Chemours had not obtained a written assessment reviewed and certified by a qualified PE in accordance with 40 C.F.R. § 270.11(d) attesting that the tank system for each of the eight tanks referenced in Paragraph 223 had sufficient structural integrity and was acceptable for the storing and treating of hazardous waste.

229.    During the 2019 FW Inspection, EPA inspected nine central accumulation areas where Chemours was accumulating hazardous waste outside of the permitted area. Chemours failed to include these nine unpermitted central accumulation areas in its RCRA Contingency Plan. Chemours RCRA Contingency Plan thus failed to minimize hazards from fires, explosions, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents. *See* 15A NCAC 13A .0107(i) [40 C.F.R. § 262.260(a) (2017)].

230.    Under the FW RCRA Permit, the central accumulation areas at Fayetteville Works where Chemours stored the two polymer 55-gallon drums and one manufacturing lab container referenced in Paragraph 220, were not and are not part of the facility's permitted container storage area.

41

*Washington Works, West Virginia*

<u>Washington Works Ownership and Operations</u>

231.    Chemours has been the owner and operator of Washington Works located at 8480 DuPont Road, Washington, West Virginia 26181 since 2015.

232.    Washington Works is about three miles downriver from Parkersburg, West Virginia, a town of approximately 30,000 people.  Just across the Ohio River from Washington Works is the city of Little Hocking, Ohio with a current population of around 650.

233.    Washington Works is located along the southeastern bank of the Ohio River.

234.    At Washington Works, Chemours engages in the manufacturing of fluoromonomers and fluoropolymers, including Teflon, and a variety of other chemical products.

<u>PFAS Use and Manufacturing at Washington Works</u>

235.    Old DuPont and Chemours have admitted that PFAS including PFOA "are present" and "have been present" in various operations at Washington Works since the 1940s.

236.    PFOA emissions are also associated with fluorotelomer production at Washington Works.

237.    From sometime in 2015 through the present, Chemours used GenX in fluoropolymer manufacturing at Washington Works.

<u>Washington Works NPDES Permits</u>

238.    The State of West Virginia, through WVDEP has been authorized to administer the NPDES program in West Virginia since May 10, 1982.

239.    Pursuant to its authority to administer the NPDES program, WVDEP issued West Virginia National Pollutant Discharge Elimination System ("WV NPDES") Permit No. WV0001279 to Old DuPont, with an effective date of September 3, 2003 ("2003 WW NPDES Permit").

42

240. The 2003 WW NPDES Permit authorized, subject to specific limitations and conditions, the discharge of stormwater, manufacturing process water, and other industrial wastewater from Washington Works through certain outlets designated in the permit.

241. The outlets designated in the 2003 WW NPDES Permit fall in the range Outlet 001 to Outlet 029.

242. The 2003 WW NPDES Permit required Old DuPont to regularly sample its discharges for PFOA but did not place limits on PFOA discharges.

243. The 2003 WW NPDES Permit set numerical limits on discharges of toluene and total suspended solids, among other parameters.

244. The 2003 WW NPDES Permit was administratively extended pursuant to 40 C.F.R. § 122.6(d) and remained in effect until September 1, 2018.

245. The 2003 WW NPDES Permit was transferred from Old DuPont to Chemours in 2015.

246. WVDEP issued a renewed WV NPDES Permit No. WV0001279 to Chemours, effective September 1, 2018, with an expiration date of July 29, 2023 ("2018 WW NPDES Permit").

247. The 2018 WW NPDES Permit was administratively extended pursuant to 40 C.F.R. § 122.6(d) and remains in effect as of the date of this Complaint.

248. The 2018 WW NPDES Permit authorizes, subject to specific limitations and conditions, the discharge of stormwater, manufacturing process water, and other industrial wastewater from Washington Works through certain outlets designated in the permit.

249. The outlets designated in the 2018 WW NPDES Permit fall in the range Outlet 001 to Outlet 036.

43

250.    The 2018 WW NPDES Permit set interim numerical limits on PFOA and HFPO-DA discharges that were in effect from September 1, 2018 to September 1, 2021, and then by extension to December 31, 2021. The interim limits provided a period of time for Chemours to prepare to comply with more stringent final limits. The final limits on PFOA and HFPO-DA discharges took effect on January 1, 2022.

251.    Section C.34 of the 2018 WW NPDES Permit as amended by the Agreed Order dated April 29, 2019, requires Chemours to sample its discharges for PFOA, HFPO-DA, and 16 other specified PFAS on a quarterly basis for Outlets 001 to 007 and on a semi-annual basis for other Outlets.

252.    Appendix A.III.2 of the 2018 WW NPDES Permit requires Chemours to submit discharge monitoring reports specifying the number of exceedances and frequency of analysis, and sets forth other monitoring and reporting requirements. Appendix A.IV.2 requires immediate reporting by phone of noncompliance that "may endanger health or the environment," and a written report within five days which contains "steps taken or planned to reduce, eliminate, and prevent recurrence of the noncompliance."

253.    The 2018 WW NPDES Permit has requirements for managing stormwater. Section C.14.c sets a numeric "benchmark value" for PFOA and certain other pollutants in stormwater, and, if there is an exceedance of the benchmark value, states that "stormwater pollution prevention practices shall be revised and implemented" and reported by letter. In addition, Section C.13 requires Chemours to "implement and maintain the stormwater pollution prevention plan ("SWPPP") for the site," which must "identify potential sources of pollution" and "describe and ensure the implementation of practices which are to be used to reduce the pollutants in stormwater discharges."

254.    The 2018 WW NPDES Permit set numerical limits on non-PFAS discharges as well. It set numerical limits on total suspended solids ("TSS"), total residual chlorine, methylene chloride, nitrogen (ammonia total), fecal general coliform, pH, temperature, and biochemical oxygen demand ("BOD") (5-day, 20 degrees Celsius), among other parameters.

255.    Appendix A.II.1 of the 2018 WW NPDES Permit states that "[t]he permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the conditions of this permit."

256.    Section C.1 of the 2018 WW NPDES Permit requires Chemours to "practice good housekeeping including maintaining the facility grounds."

257.    Section C.5 of the 2018 WW NPDES Permit provides that without prior approval from WVDEP, Chemours "shall not accept and treat wastewater from any other non-Chemours owned and operated facility," except as listed in Section C.28.

258.    WVDEP issued WV NPDES Permit No. WV0117986 to Chemours, with an effective date of July 15, 2024 ("2024 WW PFA Line 2 NPDES Permit") that authorizes, subject to specific limitations and conditions, the discharge of manufacturing process water and non-contact cooling water from Washington Works associated with a new PFA finishing line at Washington Works.

259.    Both the 2018 WW NPDES Permit and the 2024 WW PFA Line 2 NPDES Permit are currently in effect.

260.    The outlets designated in the 2003 WW NPDES Permit, the 2018 WW NPDES Permit, and the 2024 PFA Line 2 WW PFA Line 2 NPDES Permit (collectively, "Washington

45

Works Permitted Outlets") discharge into the Ohio River, either directly or via Page Run, Coal Hollow, or an unnamed tributary of the Ohio River.

261.    Page Run and Coal Hollow are each relatively permanent tributaries of the Ohio River.

262.    The Ohio River is a perennial waterway that serves as a natural boundary between several states, including West Virginia and Ohio. It runs from western Pennsylvania to the southern tip of Illinois, where it flows into the Mississippi River.

263.    The Ohio River has been designated as a jurisdictional waterway under Section 10 of the Rivers and Harbors Act by the U.S. Army Corps of Engineers.

264.    The Ohio River is a traditional navigable water and is navigable-in-fact.

Unauthorized Discharges at Washington Works

265.    Beginning in 2015, Chemours regularly sampled water discharges from Washington Works for HFPO-DA.

266.    Upon information and belief, prior to August 21, 2018, Chemours had never sampled water discharges from Washington Works for PFAS other than PFOA and HFPO-DA.

267.    On August 21, 2018, Chemours sampled its water discharges at Washington Works for a range of PFAS other than PFOA and HFPO-DA. The sampling detected 19 distinct PFAS chemicals flowing out of all six outlets tested to the Ohio River or tributaries thereof, as identified in Appendix B, Table 4, rows 1–94. For ease of reference, the 19 distinct PFAS identified in Table 4 are hereinafter referred to as "19 PFAS."

268.    Chemours shared the August 21, 2018 water sampling results with WVDEP. Upon information and belief, up until that date, Chemours had not informed WVDEP that Washington Works discharged any of the 19 PFAS.

269.    Monitoring of Washington Works discharges conducted since August 2018 has repeatedly found PFAS other than PFOA and HFPO-DA in the facility's wastewater.

270.    Upon information and belief, on numerous occasions prior to August 21, 2018, Chemours discharged the 19 PFAS from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

271.    Chemours detected PFPrA in Washington Works discharges from five outlets sampled in August or September 2019, as identified in Appendix B, Table 4, rows 95–99. PFPrA is a PFAS.

272.    Upon information and belief, on numerous occasions prior to and after August or September 2019, Chemours discharged PFPrA from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

273.    Chemours sampled Washington Works discharges in December 2022. Chemours detected PPF Acid in discharges from nine outlets, PMPA in discharges from five outlets, and PEPA in discharges from one outlet, as identified in Appendix B, Table 4, rows 100–114. PPF Acid, PMPA, and PEPA are PFAS.

274.    Upon information and belief, on numerous occasions prior to and after December 2022, Chemours discharged PPF Acid, PMPA, and PEPA from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

EPA's and WVDEP's Inspections of Washington Works

275.    On November 27–29, 2018, EPA inspected Washington Works for compliance with the 2018 WW NPDES Permit ("2018 WW Inspection"). WVDEP participated in the inspection.

276.    The 2018 WW Inspection documented staining in staging and storage areas for waste containing HFPO-DA in the vicinity of grates leading to Outlet 002 and Outlet 011. Inspectors documented rips and tears in and other damage to equipment used to stage and store waste containing HFPO-DA. PFOA and HFPO-DA were detected in soil. The observations indicated that a release may have occurred.

277.    On September 24–25, 2019, WVDEP inspected Washington Works for compliance with the 2018 WW NPDES Permit ("2019 WW Inspection").

278.    The 2019 WW Inspection included a review of data from discharge monitoring reports from September 2017 through August 2019.  That review identified multiple exceedances of the effluent limits in the 2018 WW NPDES Permit. WVDEP issued a Notice of Violation to Chemours on November 6, 2019 regarding the inspection findings.

279.    On August 19, 2021, WVDEP inspected Washington Works for compliance with the 2018 WW NPDES Permit ("2021 WW Inspection").

280.    The 2021 WW Inspection documented discharge monitoring and reporting issues, including a failure to perform monitoring for certain PFAS as specified in the permit, and the reporting of inaccurate and incomplete information. The 2021 WW Inspection also included a review of DMR data from August 2019 through August 2021, which identified multiple exceedances of the effluent limits in the 2018 WW NPDES Permit. WVDEP issued a Notice of Violation to Chemours on September 23, 2021 regarding the inspection findings.

281.    On July 20–21, 2023, WVDEP inspected Washington Works for compliance with the 2018 WW NPDES Permit ("2023 WW Inspection").

282.   The 2023 WW Inspection found that Chemours accepted wastewater from its on-site tenant Celanese without obtaining prior approval from WVDEP. Celanese was not owned or operated by Chemours.

283.   The 2023 WW Inspection observed carbon boxes for reducing PFOA and HFPO-DA that were not maintained, drop inlets that were blocked or laden with sediment, overgrown vegetation in a sand filter treatment system and drains, a short-circuiting Gabion Basket treatment system, and vehicle track-out waste from loading areas. A review of records found that the W9 wastewater treatment system was operated at nearly twice the designed capacity. It also found that regular inspections for leaks were not performed. In addition, the facility's SWPPP did not identify potential sources of pollutants or describe implementation of practices to reduce pollution.

284.   The 2023 WW Inspection documented the failure to timely submit benchmark exceedance letters for first quarter 2023 and the reporting of inaccurate and incomplete information, including the failure to describe actions to prevent noncompliance with HFPO-DA effluent limits. The 2023 WW Inspection also included a review of DMR data from August 2021 through June 2023, which identified multiple exceedances of the effluent limits in the 2018 WW NPDES Permit.

285.   WVDEP issued a Notice of Violation to Chemours on July 25, 2023 regarding the inspection findings.

<u>Exceedances of 2018 WW NPDES Permit Limits</u>

286.   According to the discharge monitoring reports submitted by Chemours to WVDEP during the period of September 30, 2018 through February 28, 2025, Chemours discharged PFOA or HFPO-DA from Washington Works Permitted Outlets in excess of 2018

WW NPDES Permit limits on numerous occasions, as identified in Appendix B, Table 2, rows 1–107.

287.    According to the discharge monitoring reports submitted by Chemours to WVDEP during the period of October 31, 2016 to August 30, 2018, Chemours discharged total suspended solids and toluene from Washington Works Permitted Outlets in excess of 2003 WW NPDES Permit limits on at least five occasions, as identified in Appendix B, Table 3, rows 1–5.

288.    According to the discharge monitoring reports submitted by Chemours to WVDEP during the period of September 30, 2018 through February 28, 2025, Chemours exceeded limits in the 2018 WW NPDES Permit on total suspended solids, total residual chlorine, methylene chloride, nitrogen (ammonia total), fecal general coliform, pH, temperature, and BOD (5-day, 20 degrees Celsius) on numerous occasions, as identified in Appendix B, Table 3, rows 6–164.

289.    According to the discharge monitoring reports submitted by Chemours to WVDEP during the period of October 31, 2024 through February 28, 2025, Chemours discharged PFOA or HFPO-DA from Washington Works Permitted Outlets in excess of 2024 WW PFA Line 2 NPDES Permit limits on numerous occasions, as identified in Appendix B, Table 2, rows 108–122.

290.    According to the discharge monitoring reports submitted by Chemours to WVDEP during the period of October 31, 2024 through February 28, 2025, Chemours exceeded limits in the WW PFA Line 2 NPDES Permit on temperature, as identified in Appendix B, Table 3, rows 165–167.

*Chambers Works, New Jersey*

Chambers Works Site and Operations

291.   Chambers Works is a multiproduct chemical manufacturing facility located at 67 Canal Road, Deepwater, New Jersey that produces hydrochlorofluorocarbons, elastomers, polymers, specialty chemicals, intermediates, and other products.  Chambers Works covers approximately 1,455 acres.

292.   On July 1, 2015, Chemours took over ownership and operation of Chambers Works.

293.   Chemours currently owns and operates Chambers Works.

294.   The Delaware River is directly adjacent to the west side of Chambers Works.

295.   Residential neighborhoods and small businesses are located to the north and east of Chambers Works.

296.   The Salem Canal, Interstate 295, and the Delaware Memorial Bridge are located due south of Chambers Works. Further south are light industrial areas, residential areas, and recreational areas.

297.   There are three main manufacturing areas at Chambers Works: (1) Elastomers Area, (2) Performance Chemicals—or "PC"—East, and (3) PC West.

298.   By July 1, 2015, Chemours took over operations of the manufacturing processes at the Elastomers Area, PC East, and PC West to manufacture various fluorochemicals and finished products, such as Viton™ Fluoroelastomers, Capstone™ Fluorotelomers, and Krytox™ ("Krytox") Lubricants.

299.   Chemours has admitted that PFAS, including PFOA, "are present" and "have been present" in Chambers Works operations.

51

300. PFAS such as PFHxA and GenX are generated during the Krytox manufacturing processes at Chambers Works.

301. Upon information and belief, subject to a reasonable opportunity for further investigation or discovery, operations at Chambers Works in addition to the Elastomer and Krytox manufacturing process use or have used PFAS, including PFOA and PFOS.

Chambers Works NPDES Permit

302. The State of New Jersey, through the New Jersey Department of Environmental Protection ("NJDEP"), has been authorized to administer the NPDES program in New Jersey since April 13, 1982.

303. Pursuant to its authority to administer the NPDES program, NJDEP issued NPDES Permit No. NJ0005100 to Old DuPont on February 1, 1999, which authorizes, subject to specific limitations and conditions, the discharge of treated process wastewater, stormwater, treated groundwater, and other industrial wastewater from Chambers Works into the Delaware River.

304. Designated Serial Number ("DSN") 662A is an internal monitoring point within Outfall 002A located at the terminus of the wastewater treatment plant—which treats process water from the various manufacturing processes performed at Chambers Works—before the wastewater is commingled with effluent from the B-Basin—which collects stormwater, groundwater, and non-contact cooling water. This commingled wastewater from the wastewater treatment plant and B-Basin is not further treated before it is discharged to the Delaware River.

305. Outfall 001A discharges into the Delaware River overflow from the B-Basin when flows are more than 56 million gallons per day at Outfall 002A.

306. Outfall 013A discharges noncontact cooling water into the Delaware River.

307. The Delaware River is a perennial waterway that serves as a natural boundary between New Jersey and Delaware. The Delaware River is located within the Lower Delaware River Basin and is a tributary to the Delaware Bay.

308. The portion of the Delaware River that Chambers Works discharges into is designated for recreation, maintenance of resident fish and other aquatic life, propagation of resident fish, passage of anadromous fish, wildlife, and navigation.

309. The Delaware River is a traditional navigable water and is navigable-in-fact.

310. The Delaware River has been designated by the U.S. Army Corps of Engineers as a jurisdictional waterway under the Rivers and Harbors Act. 33 U.S.C. §§ 403, 1362(7); 40 C.F.R. § 120.2(a).

311. NJDEP issued a renewed NPDES Permit No. NJ0005100 to Old DuPont, with an effective date of October 1, 2005 and an expiration date of September 30, 2010 ("2005 CW NPDES Permit"). The 2005 CW NPDES Permit added a PFOA weekly monitoring requirement at DSN 662A. There were no other effluent limitations or monitoring requirements related to other PFAS.

312. NJDEP issued a renewed NPDES Permit No. NJ0005100 to Old DuPont, with an effective date of September 1, 2011 and an expiration date of August 31, 2016 ("2011 CW NPDES Permit"). The 2011 CW NPDES Permit continued PFOA weekly monitoring requirement at DSN 662A. There were no other effluent limitations or monitoring requirements related to other PFAS.

313. The 2011 CW NPDES Permit was transferred from Old DuPont to Chemours in 2015.

314. The 2011 CW NPDES Permit was administratively extended pursuant to 40 C.F.R. § 122.6(d) and remained in effect until April 1, 2018.

315. NJDEP issued a renewed NPDES Permit No. NJ0005100 to Chemours, with an effective date of April 1, 2018 and an expiration date of March 31, 2023 ("2018 CW NPDES Permit").

316. The 2018 CW NPDES Permit was administratively extended pursuant to 40 C.F.R. § 122.6(d) and remains in effect as of the date of this Complaint.

317. The 2018 CW NPDES Permit requires Chemours to conduct weekly monitoring of 14 additional PFAS at DSN 662A but did not place limits on these PFAS: (1) PFBA, (2) PFPeA, (3) PFHxA, (4) PFHpA, (5) PFNA, (6) PFDA, (7) PFUnA, (8) PFDoA, (9) PFTrDA, (10) PFTeDA, (11) PFBS, (12) PFHxS, (13) PFOS, and (14) PFOSA.

318. Effective September 1, 2018, the 2018 CW NPDES Permit was modified to require that Chemours conduct weekly sampling of, but did not place limits on, HFPO-DA at DSN 662A.

319. Discharges from Chambers Works are unlawful unless expressly authorized under and in compliance with the terms and conditions of the 2018 CW NPDES Permit.

320. The 2018 CW NPDES Permit sets effluent limits on non-PFAS discharges as well, including pH, oil & grease, and chlorine.

321. The 2018 CW NPDES Permit also includes an operation and maintenance requirement in Part IV.E.4, which states that "[t]he permittee shall operate and maintain treatment works and facilities which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit . . . ."

54

322.    Sampling of surface water discharges in 2003, 2005, and 2007–2020 consistently detected PFOA and PFOS, with a maximum PFOA concentration of 5,050,000 ppt and a maximum PFOS concentration of 2,140 ppt both occurring in 2003.

<u>Unauthorized Discharges at Chambers Works</u>

323.    On March 17, 2015, NJDEP requested that Chambers Works conduct sampling for PFNA at DSN 662A over the course of a year.

324.    From July 2015 through July 2016, Chemours sampled for PFNA at DSN 662A on 14 separate occasions.

325.    PFNA was detected in the wastewater at DSN 662A each of these 14 times on the dates identified in rows 1–14 of Appendix B, Table 5 of this Complaint.

326.    In addition, Chemours also sampled for and detected PFNA at DSN 662A on January 16, 2017.

327.    NJDEP also requested Chambers Works sample for other PFAS compounds, including other PFAS identified in Appendix B, Table 5 that have been unlawfully discharged by Chambers Works.

328.    Prior to March 5, 2018, Chemours failed to perform sampling of its effluent for any PFAS compounds other than PFOA (which was required by the 2011 CW NPDES Permit) and PFNA.

329.    On March 5, 2018, Chemours sampled for and detected the following seven PFAS at DSN 662A: (1) PFPeA, (2) PFHxA, (3) PFDA, (4) PFBA, (5) PFBS, (6) PFHpA, and (7) PFNA.

330.    These seven PFAS have been regularly detected in weekly reported sampling conducted at DSN 662A pursuant to the 2018 CW NPDES Permit. Upon information and belief,

on numerous occasions prior to April 2018, Chemours discharged these seven PFAS from Outfall 002A into the Delaware River.

331.    On February 26, March 13, May 4, and August 20, 2018, Chemours sampled for and detected HFPO-DA at DSN 662A.

332.    HFPO-DA has been regularly detected in weekly reported sampling conducted at DSN 662A pursuant to the 2018 CW NPDES Permit.

333.    Upon information and belief, on numerous occasions prior to September 2018, Chemours discharged HFPO from Outfall 002A into the Delaware River.

334.    EPA sampling conducted on August 22, 2022, detected seven additional PFAS in the effluent from Outfall 002A: 10:2 FTS, 4:2 FTS, 6:2 FTS, 8:2 FTS, PFMOBA, 3,6-OPFHpA, and PFPeS.

335.    Sampling conducted by EPA on August 22 and 23, 2022, also detected 16 PFAS from both Outfalls 001A and 013A: 4:2 FTS, 6:2 FTS, 8:2 FTS, HFPO-DA, PFBA, PFBS, PFDA, PFDoA, PFHpA, PFHxA, PFNA, PFOA, PFOS, PFPeA, PFPeS, and PFUnA; and two PFAS from Outfall 001A only: 10:2 FTS and N-EtFOSAA.

<u>EPA's Inspections at Chambers Works</u>

336.    On July 9–11, 2019, EPA inspected Chambers Works for compliance with its NPDES Permit and the CWA ("2019 CW Inspection").

337.    The 2019 CW Inspection documented several feet of sediment built up in numerous pieces of equipment for the primary treatment operations at the wastewater treatment plant.

338.    In addition to the sediment buildup, the 2019 CW Inspection observed damaged equipment, such as a neutralizer and flocculators, and rusted support structures for a flow splitter and secondary clarifier.

339.    The 2019 CW Inspection documented vegetation in primary, secondary, and tertiary clarifiers; broken pumps; leaking equipment; and excessive air flow in one of the secondary treatment aerators.

340.    The 2019 CW Inspection reviewed the wastewater treatment plant's monthly process control data and shift turnover sheets, which indicated numerous additional equipment issues and failures.

341.    On August 16–24, 2022, EPA inspected Chambers Works for compliance with its NPDES Permit, the CWA, and RCRA ("2022 CW Inspection").

342.    The 2022 CW Inspection documented vegetation in primary, secondary, and tertiary clarifiers.

343.    During the 2022 CW Inspection, EPA observed Chemours' on-site landfill. Chemours takes leachate from this landfill and sends it to a secondary biological wastewater treatment system, i.e., a system used to further remove waste from wastewater following primary treatment. After the leachate is treated, sediment remains. Chemours sends the sediment through a filter press—a tool used to separate solids and liquids. This process creates sludge. Chemours conveys the sludge through chutes where it is then accumulated into a dump truck. The dump truck then returns the sludge to the on-site landfill.

344.    The sludge referenced in the preceding Paragraph is derived from multisource leachate, a solid waste that is listed in 40 C.F.R. § 261.31 (1993) (incorporated by reference in N.J.A.C. § 7:26G-5.1(a)) as a hazardous waste (designated hazardous waste code: F039).

57

345.    Because the dump truck is a portable device that stores, transports, treats, disposes of, or otherwise handles material, it constitutes a container as defined in 40 C.F.R. § 260.10 (1993) (incorporated by reference in N.J.A.C. § 7:26G-4.1(a)).

346.    At the time of the 2022 CW Inspection, Chemours qualified as an LQG at Chambers Works.

347.    During the 2022 CW Inspection, EPA observed that the dump truck containing the hazardous waste sludge referenced was not labeled with (1) the words "Hazardous Waste" or (2) the date on which the accumulation of the hazardous waste sludge began.

348.    During the 2022 CW Inspection, EPA observed that the bed of the dump truck was uncovered even though Chemours was not adding hazardous waste to, or removing such waste from, the truck.

Exceedances of 2018 CW NPDES Permit Limits

349.    According to discharge monitoring reports submitted by Chemours to NJDEP, Chemours exceeded limits in the 2018 CW NPDES Permit on pH, oil & grease, BOD, and chlorine on numerous occasions, as identified in Appendix B, Table 6.

**FIRST CLAIM FOR RELIEF**
**Fayetteville Works: Discharges Without an NPDES Permit**

350.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

351.    Chemours is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

352.    As identified in Appendix B, Table 1, on numerous occasions between June 14, 2017, and April 8, 2019, Chemours discharged at least 23 PFAS from Outfall 002 and Old Outfall 002 at Fayetteville Works into the Cape Fear River ("23 FW PFAS").

58

353. Each of the 23 FW PFAS is a chemical waste, industrial waste, or solid waste and is a "pollutant" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

354. Outfall 002 and Old Outfall 002 are discernible, confined, and discrete conveyances and are "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

355. The Cape Fear River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

356. Upon information and belief, on numerous occasions prior to June 14, 2017, Chemours discharged the 23 FW PFAS, and possibly other PFAS, from Outfall 002 and/or Old Outfall 002 into the Cape Fear River.

357. At the times that these discharges occurred, Chemours did not have a permit authorizing the discharges.

358. The discharges of the 23 FW PFAS listed in Appendix B, Table 1 between June 14, 2017, and April 8, 2019 are unlawful and in violation of the CWA.

359. The discharges of the 23 FW PFAS, and possibly other PFAS, prior to June 14, 2017 are unlawful and in violation of the CWA.

360. Chemours' unauthorized discharges of the 23 FW PFAS from Outfall 002 and Old Outfall 002 into the Cape Fear River are violations of Section 301 of the CWA, 33 U.S.C. § 1311.

361. Each of the foregoing discharges of unauthorized pollutants constitutes a violation of Section 301 of the CWA, 33 U.S.C. § 1311, for each discharge of each pollutant per day.

362.    Upon information and belief, Chemours will continue to discharge the 23 FW PFAS from Outfall 002 and/or Old Outfall 002 without authorization unless restrained by this Court.

363.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

## SECOND CLAIM FOR RELIEF
### Washington Works: Discharges in Violation of NPDES Permits

364.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

365.    Chemours is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and Section 3 of the WPCA, W. Va. Code § 22-11-3(14).

366.    PFOA and HFPO-DA are chemical waste, industrial waste, or solid waste and are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and Section 3 of the WPCA, W. Va. Code § 22-11-3(11), (12), (16).

367.    Toluene, TSS, methylene chloride, total residual chlorine, nitrogen (ammonia total), fecal general coliform, pH, temperature (heat), and BOD are chemical waste, industrial waste, or solid waste and are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and Section 3 of the WPCA, W. Va. Code § 22-11-3(11), (12), (16).

368.    The Washington Works Permitted Outlets are discernible, confined, and discrete conveyances and are, therefore, "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14), and Section 3 of the WPCA, W. Va. Code § 22-11-3(15).

369.    The Ohio River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

370.    Page Run, Coal Hollow, and an unnamed tributary of the Ohio River are tributaries of the Ohio River and, therefore, are also "navigable water[s]" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

371.    The Ohio River, Page Run, Coal Hollow, and the unnamed tributary of the Ohio River are waters of the State of West Virginia within the meaning of Section 3 of the WPCA, W. Va. Code § 22-11-3(23).

372.    The discharges of PFOA and HFPO-DA from Washington Works Permitted Outlets in excess of 2018 WW NPDES Permit limits and 2024 WW PFA Line 2 Permit limits identified in Appendix B, Table 2 are violations of the 2018 WW NPDES Permit, the 2024 WW PFA Line 2 Permit, and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, and Section 8 of the WPCA, W. Va. Code § 22-11-8.

373.    The discharges of toluene and TSS from Washington Works Permitted Outlets in excess of 2003 WW NPDES Permit limits identified in Appendix B, Table 3 are violations of the 2003 WW NPDES Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, and Section 8 of the WPCA, W. Va. Code § 22-11-8.

374.    The discharges of TSS, total residual chlorine, methylene chloride, nitrogen, fecal general coliform, pH, temperature, and biological oxygen demand (5-day, 20 degrees Celsius) from Washington Works Permitted Outlets in excess of 2018 WW NPDES Permit limits and 2024 WW PFA Line 2 NPDES Permit limits identified in Appendix B, Table 3, are violations of the 2018 WW NPDES Permit, the 2024 WW PFA Line 2 NPDES Permit, and Sections 301(a)

61

and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342, and Section 8 of the WPCA, W. Va. Code § 22-11-8.

375.    Upon information and belief, Chemours will continue to discharge pollutants from Washington Works Permitted Outlets in quantities in violation of the 2018 WW NPDES Permit and the 2024 WW PFA Line 2 NPDES Permit unless restrained by this Court.

376.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

377.    Pursuant to Section 22 of the WPCA, W. Va. Code § 22-11-22, Chemours is liable for injunctive relief to prevent future violations of the WPCA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 8 of the WPCA, W. Va. Code § 22-11-8.

## THIRD CLAIM FOR RELIEF
### Washington Works: Discharges Without NPDES Permit

378.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

379.    As identified in Appendix B, Table 4, on August 21, 2018, August and/or September 2019, and December 1, 2022, Chemours discharged certain PFAS from Outlets 001, 002, 003, 005, 006, 007, 011, 025, 030, and 033 at Washington Works into the Ohio River, either directly or through its tributaries.

380.    The PFAS identified in Table 4 are chemical waste, industrial waste, or solid waste and are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6), and Section 3 of the WPCA, W. Va. Code § 22-11-3(11), (12), (16).

62

381.    The Washington Works Permitted Outlets include Outlets 001, 002, 003, 005, 006, 007, 011, 025, 030, and 033.

382.    Upon information and belief, on numerous occasions prior to August 21, 2018, Chemours discharged the 19 PFAS, and possibly other PFAS, from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

383.    Upon information and belief, on numerous occasions prior to and after August or September 2019, Chemours discharged PFPrA from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

384.    Upon information and belief, on numerous occasions prior to and after December 1, 2022, Chemours discharged PPF Acid, PMPA, and PEPA from Washington Works Permitted Outlets into the Ohio River, either directly or through its tributaries.

385.    At the times the discharges of PFAS identified in Table 4 occurred, Chemours did not have a permit authorizing the discharges.

386.    Discharges of the 19 PFAS before September 1, 2018 are unlawful and in violation of the CWA and the WPCA.

387.    Discharges of PFPrA, PPF Acid, PMPA, and PEPA are unlawful and in violation of the CWA and the WPCA.

388.    Chemours' unauthorized discharges of PFAS, including but not limited to those identified in Table 4, from Washington Works Permitted Outlets to the Ohio River, either directly or through its tributaries, are violations of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and of Section 8 of the WPCA, W. Va. Code § 22-11-8.

389.     Each of the foregoing discharges of unauthorized pollutants constitutes a violation of Section 301 of the CWA, 33 U.S.C. § 1311, and of Section 8 of the WPCA, W. Va. Code § 22-11-8, for each discharge of each pollutant per day.

390.     Upon information and belief, Chemours will continue to discharge pollutants from Washington Works Permitted Outlets without authorization unless restrained by this Court.

391.     Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

392.     Pursuant to Section 22 of the WPCA, W. Va. Code § 22-11-22, Chemours is liable for injunctive relief to prevent future violations of the WPCA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 8 of the WPCA, W. Va. Code § 22-11-8.

## FOURTH CLAIM FOR RELIEF
### Washington Works: Failure to Comply with NPDES Permit Conditions

393.     The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

394.     The conditions documented in the 2018 WW Inspection and 2023 WW Inspection and described in Paragraphs 276 to 283 show failures to properly operate and maintain Washington Works facilities or systems of treatment and control installed or used for compliance with the 2018 WW NPDES Permit, as required under Appendix A.II.1.

395.     The conditions documented in the 2021 WW Inspection and 2023 WW Inspection and described in Paragraphs 280 and 284 show failures to monitor and report discharges at Washington Works, as required under Section C.34, Appendix A.III.2, Appendix A.IV.2.

64

396.    The conditions documented in the 2023 WW Inspection and described in Paragraph 283 show failures to manage and control stormwater at Washington Works, as required under Sections C.13 and C.14.c.

397.    The conditions documented in the 2023 WW Inspection and described in Paragraph 280 show failures to practice good housekeeping including maintaining the facility grounds at Washington Works, as required under Section C.1.

398.    The conditions documented in the 2023 WW Inspection and described in Paragraph 282 show failures to obtain prior approval to accept and treat wastewater from a non-Chemours owned and operated facility, as required under Sections C.5 and C.28.

399.    The conditions and failures described in this Claim for Relief are violations of the 2018 WW NPDES Permit and Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, and of Section 8 of the WPCA, W. Va. Code § 22-11-8.

400.    Unless enjoined, Chemours' violations are likely to continue.

401.    Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

402.    Pursuant to Section 22 of the WPCA, W. Va. Code § 22-11-22, Chemours is liable for injunctive relief to prevent future violations of the WPCA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 8 of the WPCA, W. Va. Code § 22-11-8.

**FIFTH CLAIM FOR RELIEF**
**Chambers Works: Discharges Without NPDES Permit**

403.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

404.    Chemours is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

405.    As identified in Appendix B, Table 5, Chemours has discharged certain PFAS in its wastewater from Outfall 002A (via internal monitoring point DSN 662A), Outfall 001A, and Outfall 013A directly into the Delaware River ("20 CW PFAS").

406.    Each of the 20 CW PFAS identified in Table 5 are a chemical waste, industrial waste, or solid waste and are a pollutant as that term is defined in 33 U.S.C. § 1362(6).

407.    Outfalls 001A, 002A, and 013A are discernible, confined, and discrete conveyances and are "point sources" within the meaning of 33 U.S.C. § 1362(14).

408.    The Delaware River is a "navigable water" as that term is defined in 33 U.S.C. § 1362(7).

409.    Chemours' unauthorized discharges of the 20 CW PFAS from Outfalls 001A, 002A, and 013A into the Delaware River constitute discharges of pollutants from a point source to waters of the United States without authorization under an NPDES permit pursuant to Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

410.    Upon information and belief, on numerous occasions prior to April 1, 2018, Chemours discharged PFPeA, PFHxA, PFDA, PFBA, PFBS, PFHpA, and PFNA from Outfall 002A into the Delaware River. Discharges of these PFAS occurring before April 1, 2018 are unlawful and in violation of the CWA.

66

411. Upon information and belief, on numerous occasions prior to September 1, 2018, Chemours discharged HFPO-DA from Outfall 002A into the Delaware River. Discharges of HFPO-DA before September 1, 2018 are unlawful and in violation of the CWA.

412. Upon information and belief, on numerous occasions prior to and after August 22–23, 2022, Chemours discharged 10:2 FTS, 4:2 FTS, 6:2 FTS, 8:2 FTS, PFMOBA, 3,6-OPFHpA, and/or PFPeS from Outfalls 002A, 001A, and 013A into the Delaware River. Discharges of these PFAS are unlawful and in violation of the CWA.

413. Upon information and belief, on numerous occasions prior to and after August 22–23, 2022, Chemours discharged HFPO-DA, PFBA, PFBS, PFDA, PFDoA, PFHpA, PFHxA, PFNA, PFOA, PFOS, PFPeA, N-EtFOSAA and/or PFUnA from Outfalls 001A and 013A into the Delaware River. Discharges of these PFAS from Outfalls 001A and 013A are unlawful and in violation of the CWA.

414. Chemours' unauthorized discharges of PFAS, including but not limited to the PFAS identified in Appendix B, Table 5 from Outfalls 001A, 002A, and 013A to the Delaware River, either directly or through its tributaries, are violations of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

415. Each of the foregoing discharges of unauthorized pollutants constitutes a violation of Section 301 of the CWA, 33 U.S.C. § 1311, for each discharge of each pollutant per day.

416. Upon information and belief, Chemours will continue to discharge pollutants from Outfalls 001A, 002A, and 013A without authorization unless restrained by this Court.

417. Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil

67

penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

<b><u>SIXTH CLAIM FOR RELIEF</u></b>
<b>Chambers Works: Discharges in Violation of NPDES Permit</b>

418.   The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

419.   Chemours is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

420.   Chlorine, pH, BOD, and oil & grease are "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

421.   Outfalls 001A and 002A are discernible, confined, and discrete conveyances and are, therefore, "point sources" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

422.   The Delaware River is a "navigable water" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

423.   The discharges of pH, chlorine, and oil & grease from Outfalls 001A and 002A in excess of 2018 CW NPDES Permit limits identified in Appendix B, Table 6 are violations of the 2018 CW NPDES Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342.

424.   Upon information and belief, Chemours will continue to discharge pollutants from Outfalls 001A and 002A in quantities in violation of the 2018 CW NPDES Permit unless restrained by this Court.

425.   Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil

68

penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

## SEVENTH CLAIM FOR RELIEF
### Chambers Works: Failure to Comply with NPDES Permit Condition—Proper Operation and Maintenance

426.   The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

427.   The conditions documented in the 2019 CW Inspection and 2022 CW Inspection and described in Paragraphs 336–340 show failures to properly operate and maintain Chambers Works treatment works and facilities installed and/or used to achieve compliance with the terms and conditions of the 2018 CW NPDES Permit, as required under Part IV.E.4 of the NPDES Permit.

428.   Chemours' failures to properly operate and maintain all Chambers Works treatment works and facilities installed or used for compliance with the NPDES Permit are violations of the 2018 CW NPDES Permit and Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342.

429.   Unless enjoined, Chemours' violations are likely to continue. Pursuant to Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), Chemours is liable for injunctive relief to prevent future violations of the CWA and for civil penalties not to exceed the statutory maximum per day for each violation of Section 301 of the CWA, 33 U.S.C. § 1311(a).

69

## EIGHTH CLAIM FOR RELIEF
### Fayetteville Works: Failure to Include All Relevant Information in Premanufacture Notice

430.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

431.    Fayetteville Works is a "site[] controlled by the submitter" for purposes of the 2008 PMN. 15 U.S.C. § 2604(d); 40 C.F.R. § 720.45.

432.    By failing to include information about GenX releases from the Nafion process at Fayetteville Works, the 2008 PMN did not include all information, to the extent known or reasonably ascertainable, about worker exposure to GenX and environmental releases of GenX.

433.    Failure to include information about worker exposure to GenX and environmental releases of GenX in the 2008 PMN is a violation of TSCA Section 5(d), 15 U.S.C. § 2604(d), and 40 C.F.R. § 720.45.

434.    Due to these deficiencies, the 2008 PMN violated Section 15(1) of TSCA, 15 U.S.C. § 2614.

435.    Chemours is a "person" as that term is defined at 40 C.F.R. § 720.3(x).

436.    GenX is a "chemical substance" as that term is defined in TSCA Section 3(2)(A)(i), 15 U.S.C. § 2602(2)(A)(i).

437.    Upon information and belief, Chemours will continue to manufacture GenX without an adequate PMN submission unless restrained by this Court.

438.    Pursuant to TSCA Section 17, 15 U.S.C. § 2616, Chemours is liable for permanent injunctive relief.

## NINTH CLAIM FOR RELIEF
### Chambers Works, Fayetteville Works, Washington Works, and Parlin: Violations of TSCA GenX Section 5(e) Order by Failing to Comply with the Recordkeeping Provision for the GenX 99% Restriction

439.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

440.    Chemours' mass balance model fails to demonstrate and document Chemours' compliance with the 99% Restriction.

441.    Chemours is a "person" as that term is defined at 40 C.F.R. § 720.3(x).

442.    GenX is a "chemical substance" as that term is defined in TSCA Section 3(2)(A)(i), 15 U.S.C. § 2602(2)(A)(i).

443.    Chemours' ongoing failure to comply with the Recordkeeping Provision for the GenX 99% Restriction is a failure to comply with an order issued under TSCA and thus is a violation of Section 15(1) of TSCA, 15 U.S.C. § 2614(1).

444.    Upon information and belief, Chemours will continue to fail to comply with the Recordkeeping Provision for the GenX 99% Restriction unless enjoined by this Court.

445.    Pursuant to TSCA Section 17, 15 U.S.C. § 2616, Chemours is liable for permanent injunctive relief.

## TENTH CLAIM FOR RELIEF
### Fayetteville Works: Unlawful Manufacture and Processing of HFPO Outside of Enclosed Process in Violation of Section 5

446.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

447.    Chemours manufactures and processes HFPO at Fayetteville Works.

71

448.    HFPO is subject to a SNUR, which specifies that a "significant new use is any use other than as an intermediate in the manufacture of fluorinated substances in an enclosed process." 40 C.F.R. § 721.4160(a)(2).

449.    HFPO emissions from Fayetteville Works are not consistent with HFPO's use as an intermediate in the manufacture of fluorinated substances in an enclosed process.

450.    Chemours' manufacture and processing of HFPO outside of an enclosed process at Fayetteville Works is prohibited under TSCA Section 5(a)(1)(A)(ii), 15 U.S.C. § 2604(a)(1)(A)(ii). Chemours failed to submit a SNUN in accordance with TSCA Section 5(a)(1)(B), 15 U.S.C. § 2604(a)(1)(B), and 40 C.F.R. § 721.25, prior to manufacturing and processing HFPO outside of an enclosed process at Fayetteville Works.

451.    Without the required SNUN, EPA has been denied the opportunity to conduct a review and make a determination under TSCA Section 5(a)(3), 15 U.S.C. § 2604(a)(3), as to whether it is necessary to prohibit or limit Chemours' manufacture and processing of HFPO at Fayetteville Works through the issuance of an order under Section 5(e) or (f), 15 U.S.C. § 2604(e) or (f), before Chemours began manufacturing and processing HFPO there for a significant new use.

452.    Chemours is a "person" as that term is defined at 40 C.F.R. § 720.3(x).

453.    HFPO is a "chemical substance" as that term is defined in TSCA Section 3(2)(A)(i), 15 U.S.C. § 2602(2)(A)(i).

454.    Chemours' manufacture and processing of HFPO at Fayetteville Works and its failure to submit a SNUN for this significant new use is a violation of Sections 5(a)(1) and 15(1) of TSCA, 15 U.S.C. §§ 2604(a)(1) and 2614(1).

455.    Upon information and belief, Chemours will continue to manufacture or process HFPO for a significant new use without EPA's review and determination unless restrained by this Court.

456.    Pursuant to TSCA Section 17, 15 U.S.C. § 2616, Chemours is liable for permanent injunctive relief.

## ELEVENTH CLAIM FOR RELIEF
### Fayetteville Works: Unlawful Manufacture and Processing of Carbooxohalide in Violation of Section 5

457.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

458.    Chemours' manufacture and/or processing of 10,000 pounds or more per year of Carbooxohalide is prohibited under TSCA Section 5(a)(1)(A)(ii), 15 U.S.C. § 2604(a)(1)(A)(ii). Chemours failed to submit a SNUN in accordance with TSCA Section 5(a)(1)(B), 15 U.S.C. § 2604(a)(1)(B), and 40 C.F.R. § 721.25, prior to commencing its manufacture and processing of 10,000 pounds or more per year of Carbooxohalide.

459.    Without the required SNUN, EPA has been denied the opportunity to conduct a review and make a determination as specified under TSCA Section 5(a)(3), 15 U.S.C. § 2604(a)(3), as to whether it is necessary to prohibit or limit Chemours' manufacture or processing of Carbooxohalide at Fayetteville Works through the issuance of an order under Section 5(e) or (f), 15 U.S.C. § 2604(e) or § 2604(f), prior to Chemours' manufacture or processing of Carbooxohalide for a significant new use.

460.    Chemours is a "person" as that term is defined at 40 C.F.R. § 720.3(x).

461.    Carbooxohalide is a "chemical substance" as that term is defined in TSCA Section 3(2)(A)(i), 15 U.S.C. § 2602(2)(A)(i).

462.    Chemours' manufacture or processing of Carbooxohalide at Fayetteville Works and its failure to submit a SNUN for this significant new use is a violation of Sections 5(a)(1) and 15(1) of TSCA, 15 U.S.C. §§ 2604(a)(1) and 2614(1).

463.    Upon information and belief, Chemours will continue to manufacture or process Carbooxohalide for a significant new use without EPA's review and determination unless restrained by this Court.

464.    Pursuant to TSCA Section 17, 15 U.S.C. § 2616, Chemours is liable for permanent injunctive relief.

## TWELFTH CLAIM FOR RELIEF
### Fayetteville Works: Violation of Conditions of FW RCRA Permit – Accepting Shipments of Hazardous Waste from Off-Site

465.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

466.    By accepting shipments of hazardous waste at Fayetteville Works from off-site, Chemours failed to comply with Paragraphs I.D.1 and II.C of the FW RCRA Permit.

467.    By failing to comply with all conditions of its FW RCRA Permit, Chemours violated N.C.G.S. § 130A-290(c) and (g) and 15a NCAC 13A.0113 [42 U.S.C. § 6925(a) and 40 C.F.R. § 270.30(a) (2017)].

468.    On January 5, 2021, EPA and Chemours entered into a Consent Agreement and Final Order ("CAFO") requiring Chemours to develop and implement a plan to properly characterize under RCRA all spent fluorine containing surfactant wastes directed to Fayetteville Works from off-site sources, including Chemours Netherlands, to ensure that it does not accept hazardous waste for recovery. The CAFO did not assess a civil penalty, and EPA expressly reserved in that instrument the right to pursue civil penalties for the violations alleged therein.

74

469.    Under Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), Chemours is liable to the United States for civil penalties not to exceed the statutory maximum per day for each violation of RCRA.

## THIRTEENTH CLAIM FOR RELIEF
**Fayetteville Works: Unauthorized Storage of Hazardous Waste**

470.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference. During the 2019 FW Inspection, Chemours failed to comply with the following conditions of the NC LQG Permit Exemption:

a.    The labeling conditions requiring tanks containing hazardous waste to be labeled with the words "Hazardous Waste" and tanks and containers to contain an indication of the hazards of their contents;

b.    the structural integrity-assessment condition requiring a written assessment reviewed and certified by a qualified PE in accordance with 40 C.F.R. § 270.11(d) attesting that tank systems have sufficient structural integrity and are acceptable for the storing and treating of hazardous waste; and

c.    the emergency-procedures condition requiring Chemours to prepare for and prevent emergencies, 15A NCAC 13A .0107(a) [40 C.F.R. § 262.17(a)(6) (2017)], by designing its RCRA Contingency Plan so as to minimize hazards from fires, explosions, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents, *see* 15A NCAC 13A .0107(i) [40 C.F.R. § 262.260(a) (2017)].

471.    By failing to comply with all conditions of the NC LQG Permit Exemption, which, if fully complied with, would have authorized Chemours to store hazardous waste in containers and tanks without such storage being covered by the FW RCRA Permit, Chemours

stored hazardous waste without a permit in violation of Section 3005(a) of RCRA, 42 U.S.C.
§ 6925(a) and 40 C.F.R. § 270.1(c) (as incorporated by N.J.A.C. § 7:26G-12.1(a) (1993)).

472.   By storing hazardous wastes in containers located outside of the permitted container storage area when no emergency permit issued under 40 C.F.R. § 270.61 authorized Chemours to do so, Chemours failed to comply with Parts I.A, I.D.1, and III of the FW RCRA Permit.

473.   By storing hazardous wastes in tanks that were not and are not among those permitted to store hazardous waste when no emergency permit issued under 40 C.F.R. § 270.61 authorized Chemours to do so, Chemours failed to comply with Parts I.A, I.D.1, and IV of the FW RCRA Permit.

474.   By failing to comply with Conditions I.A, I.D.1, III, and IV of the FW RCRA Permit without possessing an emergency permit authorizing such noncompliance, Chemours violated the N.C. Hazardous Waste Management Rules and N.C.G.S. § 130A-Article 9 [40 C.F.R. § 270.30(a) (2017)]. *See* N.C.G.S. § 130A-294 (c) and (g) [42 U.S.C. § 6925(a)]; 15A NCAC 13A .0113(f) [40 C.F.R. § 270.30(a) (2017)].

475.   Chemours violated Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), because it did not have a RCRA Permit that authorized the manner in which it stored hazardous waste and because it did not qualify for the NC LQG Permit Exemption. Alternatively, Chemours violated Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), because it stored hazardous waste in a manner that did not comply with the conditions of the FW RCRA Permit and thus violated the N.C. Hazardous Waste Management Rules and N.C.G.S. 130A Article 9 [40 C.F.R. § 270.30(a) (2017)].

476.    Under Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Chemours is liable for civil penalties not to exceed the statutory maximum per day for each violation of RCRA.

**FOURTEENTH CLAIM FOR RELIEF**
**Chambers Works: Unauthorized Storage of Hazardous Waste**

477.    The allegations of the foregoing Paragraphs are realleged and incorporated herein by reference.

478.    EPA's observation during the 2022 CW Inspection of the uncovered dump truck storing hazardous waste referenced in Paragraph 343 shows that Chemours failed to comply with the following conditions of the NJ LQG Permit Exemption:

a.    the labeling conditions requiring containers storing hazardous waste to include the words "Hazardous Waste" and the date on which the accumulation of the hazardous waste began; and

b.    the condition requiring containers accumulating hazardous waste to be closed except when it is necessary to add or remove waste.

479.    By failing to comply with all conditions of the NJ LQG Permit Exemption, which, if fully complied with, would have authorized Chemours to store hazardous waste in the dump truck referenced in Paragraph 343 without a permit, Chemours stored hazardous waste without a permit in violation of Section 3005 (a) of RCRA, 42 U.S.C. § 6925(a), and 40 C.F.R. § 270.1(c) (as incorporated by N.J.A.C. § 7:26G-12.1(a) (1993)).

480.    Because the dump truck referenced in Paragraph 343 was uncovered when it was not necessary to add hazardous waste to, or remove such waste from, the dump truck, Chemours failed to comply with Paragraph 81 of the CW RCRA Permit.

481.    Chemours' failure to comply with Paragraph 81 of the CW RCRA Permit violated Section 3005 (a) of RCRA, 42 U.S.C. § 6925(a), and 40 C.F.R. § 270.30 (as incorporated by N.J.A.C. § 7:26G-12.1(a) (1993)).

482.    Under Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), Chemours is liable for civil penalties not to exceed the statutory maximum per day for each violation of RCRA.

<h2 style="text-align:center"><u>REQUEST FOR RELIEF</u></h2>

WHEREFORE, the United States of America and the State of West Virginia respectfully request that this Court:

A.    Permanently enjoin Chemours from discharging pollutants except as expressly authorized by the CWA and the WPCA and in compliance with the limitations and conditions of any currently applicable NPDES permit at Fayetteville Works, Washington Works, and Chambers Works;

B.    Permanently enjoin Chemours from the manufacture or processing of HFPO and Carbooxohalide, except in compliance with TSCA and any applicable regulatory requirements;

C.    Remand the determination EPA made on the 2008 PMN under TSCA Section 5(a)(3), 15 U.S.C. § 2604(a)(3), and the corresponding GenX 5(e) Order so that EPA can make a new determination under TSCA Section 5(e) or (f), 15 U.S.C. § 2604(e) or (f), on the 2008 PMN based on all relevant risk information, and issue any appropriate order under TSCA Section 5(e) or (f), 15 U.S.C. § 2604(e) or (f), consistent with its determination. Additionally, order Chemours to comply fully with the terms of the remanded GenX 5(e) Order until EPA makes a new determination under Section 5(a)(3), 15 U.S.C. § 2604(a)(3), and issues any appropriate order under TSCA Section 5(e) or (f), 15 U.S.C. § 2604(e) or (f), consistent with its

determination. Alternatively, if the Court does not remand EPA's determination on the 2008

PMN and the corresponding GenX 5(e) Order, permanently enjoin Chemours from the

manufacture, processing, distribution, use, and disposal of GenX, except in compliance with

TSCA and any applicable regulatory requirements;

D.      Order Chemours to take all necessary actions to remedy, mitigate, and offset the

harm to public health and the environment caused by the CWA, WPCA, RCRA and TSCA

violations alleged above;

E.      Assess civil penalties against Chemours of up to $37,500 per day for each

violation of the CWA occurring prior to November 2, 2015, and up to $68,445 per day for each

violation occurring after November 2, 2015 (and assessed on or after January 25, 2025);

F.      Assess civil penalties against Chemours of up to $25,000 per day for each

violation of the WPCA;

G.      Assess civil penalties against Chemours of up to $90,702 per day for each

violation of RCRA occurring after November 2, 2015;

H.      Order Chemours to comply with all requirements of the Authorized State

Hazardous Waste Programs and federal RCRA requirements that are effective in North

Carolina and New Jersey;

I.      Award the United States its costs in this action; and

J.      Grant such other relief as the Court may deem appropriate.

//

//

//

//

Respectfully submitted,


FOR THE UNITED STATES OF AMERICA

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment And Natural Resources Division
United States Department of Justice


STEVEN O'ROURKE
KATHERINE A. ABEND
Senior Counsels

*s/ Sylvia Lam*
SYLVIA LAM (MD Bar No. 1512160028)
JONAH SELIGMAN
Trial Attorneys
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: 202-598-1892
Email: Sylvia.Lam@usdoj.gov


MOORE CAPITO
United States Attorney

*s/ Jason S. Bailey*
JASON S. BAILEY
Assistant United States Attorney
W. Va. State Bar No. 13582
Southern District of West Virginia
Robert C. Byrd U.S. Courthouse
300 Virginia Street East, Suite 4000
Charleston, WV 25301
Phone: 304-345-2200
Fax: 304-347-5443
E-mail: jason.bailey2@usdoj.gov

OF COUNSEL:
Gracie Pendleton
U.S. EPA

FOR THE WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION


*s/ C. Scott Driver*
C. Scott Driver
Chief, Office of Legal Services
W.Va. Bar ID #9846
West Virginia Department of Environmental Protection
601 57th Street Southeast
Charleston, WV 25304
(304) 926-0499 x41221
charles.s.driver@wv.gov

81